**JAYS FOODS, INC., an Illinois corporation, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 13208.

United States Court of Appeals
Seventh Circuit.

July 25, 1961.

Bernard M. Kaplan, Blanksten & Lansing, Chicago, Ill. (Harold S. Lansing, Chicago, Ill., of counsel), for petitioner, Jays Foods, Inc.

Marcel Mallet-Prevost, Asst. Gen. Counsel, William J. Avrutis, Atty., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Allison W. Brown, Jr., Atty., National Labor Relations Board, Washington, D. C., for respondent.

Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Before us is the petition of Jays Foods, Inc., an Illinois corporation, herein referred to as petitioner, to review and set aside an order of the National Labor Relations Board entered pursuant to section 10(c) of the National Labor Relations Act, as amended (29 U.S.C.A. § 151 et seq.), and reported in 129 N.L.R.B. No. 70. In its answer to the petition the Board has requested enforcement of its order.

The Board, affirming the rulings of a trial examiner and adopting his findings, conclusions and recommendations, found that petitioner, in order to avoid bargaining with a union,[1] its employees' lawful representative, discharged six mechanics and discontinued the department in which they worked, thereby violating section 8 (a) (1), (3) and (5) of the Act.

At relevant times, petitioner, a manufacturer of potato chips and popcorn, employed a total of 275 employees in its main plant and four branches in Chicago, Illinois, and at two additional branches in Wisconsin. It used 115 automobile trucks to deliver its products in Chicago, and, until July 31, 1959, employed seven mechanics under its fleet superintendent, John R. Jutkins, to maintain and keep them in repair. Five of these mechanics regularly worked with Jutkins at the garage attached to the main plant, and the other two at garages attached to branch plants in the area.

In March 1958, Jutkins and Thomas Stanislawski, petitioner's treasurer and comptroller, instituted a system of ascertaining the cost of operation of the automotive repair and maintenance department, and, until July 31, 1959, they made

---

1. Automobile Mechanics Lodge No. 701, International Association of Machinists, AFL–CIO, herein referred to as the union.

a weekly review of the job sheets relative to the keeping of costs. A steady increase of costs in that department was noted and was considered "a warning signal that it was getting a little out of hand". They had more than a dozen conversations after the making of these reports and, prior to July 31, 1959, in comparing the merits and costs of farming out this work with the cost of doing it in petitioner's own shop, Stanislawski in July 1958 concluded that it would be cheaper to farm out the work, and Jutkins, prior to July 31, 1959, became definitely convinced that costs could be reduced by farming out the work to outside independent garages.

Shortly before Christmas 1958, at the home of Mr. Japp, president of petitioner, Jutkins discussed a change to farming out operations at the Silver Lake and Milwaukee plants. He pointed out that farming out "was showing quite an appreciable contrast in the lower cost * * * rather than send our men to Milwaukee and Silver Lake", and he suggested "that maybe we would be better off if we farmed all our work out".

In March 1959, when Japp told Jutkins "things are tightening up and we have to cut our expenses", the question of farming work out was again discussed, and both agreed that it would seem that the costs of automotive repairs and maintenance could be reduced thereby, although Jutkins thought that convenience and timing are gone if all the work was farmed out.[2]

Petitioner consented to the election which was conducted on July 21, 1959, when six of the seven employees in the unit voted for the union and one against. On the same day, Mr. Japp asked business agent Lo Furno of the union, who was then on the main plant premises, if the latter wanted to see Japp then to talk it over and Lo Furno said "No, we have to wait until we are certified."

On July 24, 1959, Lo Furno left two copies of the proposed union contract with Jutkins to give to Japp. The contract was reviewed by Japp, Jutkins and Stanislawski. Their reaction to the terms of the proposed contract is probably typified by Stanislawski's remark: "Cripes, we can't live with this; it is too much." An examination of the record reveals that, for instance, four employees classed as mechanics who were being paid $2.50 per hour would under the proposed contract receive either $2.96 or $2.91 per hour depending on whether they were classed as "automotive machinists" or "mechanics." The wages of a mechanic's helper would have increased from $1.85 to $2.46 per hour. The contract also provided for an across-the-board wage increase effective April 1, 1960, and other benefits.

All of the above-cited evidence and data relative to petitioner's cost factors and the comparative costs of handling the work itself, as compared to farming it out to independent garages, clearly indicates that petitioner, at least a year before the union election, was acutely

2. Jutkins testified that the following factors made the labor costs of petitioner, when doing its own repair and maintenance work, more costly and less efficient than if the work were farmed out: (1) much overtime pay, as reflected in petitioner's exhibits 5A to 5G inclusive; (2) lost time incident to employees driving and riding in trucks to and from branch shop; (3) lost time spent in going out for automotive parts, stock room space being limited, and sending jobs to outside garages where facilities and parts were available, repairs could be done cheaper; (4) since outside work was normally guaranteed, it avoided duplication of labor charges involved where job

was done by respondent's department, and work or job proved defective and had to be done over, and (5) nonproductive time in shop during day when trucks were on the street.

Jutkins also testified to a sampling of various job sheets from January through July 1959. For instance, an oil and grease job, when done by petitioner's shop cost $4.50 in labor charges, but it cost only $2 when done by an outside garage; also the labor cost for changing a tire on the road was $4.37 including the time spent by the mechanic in traveling to the truck and back to the shop, whereas an outside garage would charge $2.50 for the service.

cost-conscious, was already considering farming out all of its automotive repair and maintenance work in order to further reduce its costs, and had already embarked on such a program at noticeable savings in comparative labor costs.[3]

No replacement employees have been hired, and petitioner has, since July 31, 1959, consistently followed the policy of not doing any of the automotive repair and maintenance work itself, but has instead farmed out all such repair and maintenance work to outside independent garages.

The foregoing facts appear in the record and are not contradicted. They clearly establish that petitioner's sole reason for abolishing its self-service operation of an automotive repair and maintenance department, which involved the discharge of its employees therein, and the shifting to a farming-out policy long contemplated prior to the election of July 31, 1959 and consistently followed since its inception, was not a discrimination against employees because of union membership or activities. It was simply the exercise of a right of management to avert a threatened economic loss and operate its business according to established principles.

█ An employer has a right to consider objectively and independently the economic impact of unionization of his shop and to manage his business accordingly. Fundamentally, if he makes a change in operation because of reasonably anticipated increased costs, regardless of whether they are caused by or contributed to by the advent of a union or by some other factor, his action does not constitute discrimination within the provisions of section 8(a) (1), (3) and (5) of the Act. See National Labor Relations Board v. Lassing, 6 Cir., 284 F.2d 781, 783, where the court said:

"* * * A change in operations motivated by financial or eco-

nomic reasons is not an unfair labor practice under the Act."

To the same effect is National Labor Relations Board v. Houston Chronicle Pub. Co., 5 Cir., 211 F.2d 848, at page 851, where the court said:

"* * * The issue is not whether the business reasons advanced by the respondent were good or bad, but whether the respondent actually in good faith had business motives for the change, or whether the change was illegally motivated. * * *"

The Board's position in the case at bar is clearly inconsistent with its recent decision in National Labor Relations Board v. Fibreboard Paper Products Corp., 130 N.L.R.B. No. 161, 47 L.R.R.M. 1547, 1549, decided on March 27, 1961. In that case, the Board held that an employer did not violate the Act, by failing to bargain with a union that represented maintenance employees, concerning the employer's decision to contract out maintenance work, since such decision is not concerned with conditions of employment but with questions of whether an employment relationship shall exist. The Board held that an employer has no statutory obligation to bargain with a union concerning basic management decisions, such as whether, and to what extent, to risk capital and managerial effort; and that the employer's action in contracting out maintenance work and discharging existing maintenance employees was not discriminatory, although the union was not informed of employer's intention to contract out maintenance work until four days before expiration of an existing contract.

█ We hold that the objective evidence in the record barred the Board

3. Prior to July 31, 1959, petitioner had been shifting to a policy of farming out its automotive repairs and maintenance work in connection with its other plants, including Milwaukee, Silver Lake, the North Side plant in Chicago and the West Side or Oak Park plant, and it was only in the plant where the election now under consideration was held that most of this work was still being done by the employees of a department.

from a subjective determination that petitioner was motivated by a discriminatory purpose.

The Board relies on Order of Railroad Telegraphers v. Chicago & N. W. R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774, where, according to the Board, an employer similarly asserted that it was within its managerial prerogative to abandon part of its operations and unilaterally abolish jobs without consulting the representative of the employees affected. We believe that this reliance on Railroad Telegraphers is not justified here. That case did not involve a construction of the National Labor Relations Act, but did involve a construction of the Railway Labor Act, and the Interstate Commerce Act, as well as the duty of the Interstate Commerce Commission under 49 U.S.C.A. § 5(2) (f) to require, where combinations and consolidations of railroads might adversely affect the interest of employees, a "fair and equitable arrangement to protect the interests of the railroad employees affected" before approving such consolidations. The railroad brotherhoods in that case were recognized bargaining units under existing agreements with the railroads. In other words, the bargaining relation was preexistent when the railroads attempted to unilaterally abolish jobs without consulting the representatives of the employees affected. The brotherhoods' position was buttressed by the bar against injunctive relief in a labor dispute set up by the Norris-LaGuardia Act, and the brotherhoods took the position that the railroad had refused to negotiate in good faith on the proposed change in violation of § 2, First, of the Railway Labor Act (45 U.S.C.A. § 152, First).

On the other hand, in the case before us there is no bargaining agreement in effect; neither the Norris-LaGuardia nor the Railway Labor Act applies; there is no dispute as to conditions or terms of employment as to which bargaining might be required; there is only a basic question of whether an employment relationship is existent, or continues to exist. From the authorities which we have cited, including the recent decision in Fibreboard Paper Products, it is obvious that Railway Telegraphers is not applicable here.

From our review of the entire record and for the reasons hereinbefore set forth, we conclude that the inferences on which the findings of the Board were based are so overborne by evidence calling for contrary inferences, as set forth in this opinion, that the findings of the Board cannot, on the consideration of the whole record, be deemed to be supported by substantial evidence.

Therefore the request for a decree to enforce the Board's order is denied and that order is set aside.

Order set aside.