**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**SERVETTE, INC., Respondent.**

**No. 17660.**

United States Court of Appeals
Ninth Circuit.

Dec. 28, 1962.

———◆———

Before CHAMBERS and JERTBERG, Circuit Judges, and CLARK, District Judge.

Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Allison W. Brown, Jr., and Warren M. Davison, Attorneys, National Labor Relations Board, Washington, D. C., for appellant.

Hill, Farrer & Burrill, Carl M. Gould, Edwin H. Franzen, Stanley E. Tobin and Barry R. Weiss, Los Angeles, Cal., for appellee.

Before CHAMBERS and JERTBERG, Circuit Judges, and CLARK, District Judge.

CHASE A. CLARK, District Judge.

The National Labor Relations Board has petitioned this court for enforcement of its order entered against Servette, Inc., Los Angeles, California, and its officers, agents, successors and assigns.

This Court has jurisdiction by virtue of Section 10(e) of the National Labor Relations Act, as amended.

The National Labor Relations Board found respondent guilty of certain unfair labor practices in violation of Sections 8(a) (1) and 8(a) (5) of the N. L.R.A., 29 U.S.C.A. § 158(a) (1) and (5), reversing the finding of the trial examiner. The respondent was ordered by the Board to cease and desist such practices and was also ordered to take certain affirmative action to effectuate the policies of the Act.

The findings by the Board which are the basis of the questions presented to the Court here may be summarized as follows: Respondent violated the Act by refusing to bargain with the Union regarding changes in its employees' working conditions and by thereafter refusing to recognize the Union as representative of its employees, and further, by soliciting revocations of union authority from its employees and by carrying on direct discussions with groups of employees to persuade them to execute franchise contracts.

Respondent Company is engaged in the distribution of specialty merchandise and has places of business in Santa Ana, San Bernardino, San Diego and Los Angeles. In the first three places the Company operated under a franchise system. At Los Angeles the company employed

fourteen driver-salesmen to distribute its products. Local #848 was the Union representing the driver-salesmen in the unit of employees and the relationship of the parties was governed by a collective bargaining agreement executed by the Company and the Union, which extended from December 1, 1958, to January 3, 1960. This agreement provided that the contract would be automatically renewed from year to year unless either party gave written notice of a desire to modify or terminate same at least sixty days prior to January 3, 1960. It is undisputed that the contract was observed by the parties during its term.

As the time of expiration of the contract neared, the Company took steps to change its method of operation in Los Angeles to that of the other cities, it having been determined that the independent retailer method of doing business was more advantageous to the company. The proposed franchise agreement, which some of the men ultimately signed, was in evidence and appears to be what the Trial Examiner found it to be —a bona-fide wholesaler-retailer relationship to deal in Servette products.

The evidence shows that in late October or early November, 1959, Ellis, president of the company, and one Finley, the Union Business Agent, met at the company plant and Finley was advised that the company expected to inaugurate a franchise system after the first of the year.

On December 3, 1959, Ellis and Liebeman, company vice-president, met with Union Business Agents Finley and Williams. The Business Agents' purpose of meeting was to discuss a new contract whereupon they were advised that the company was considering a franchise set-up which had not been yet completely worked out by the Company. Thereafter, Ellis was contacted by John Bowers, Secretary-Treasurer of the Union. Further discussion was had about the company's plan for a franchise. Ellis told Bowers that the company would at all times negotiate with the Union for any of the employees who chose to remain with the company as driver-salesmen who did not accept a franchise. He also said that he had suggested to the men that those who accepted franchises should remain in the Union as independent contractors.

Bowers said he would not negotiate for independent contractors and would only negotiate for all the men on an employee basis—negotiating for all in the unit or none.

January 8, 1960, the Company held a dinner for the driver-salesmen in Los Angeles and the franchisees in the other cities. Ellis distributed copies of the proposed franchise agreement which was gone over by all present and driver-salesmen who wished to become franchisees were asked to notify the Company the following Monday morning of their desires. Ellis told them he estimated that the franchisees would make more money but said that anyone who wished to remain in an employee status as driver-salesman would be continued and no one would be discharged. Concerning Union affiliation after accepting the franchise, Ellis remarked that those men might wish to join the Retail Clerks Union, as that organization represented employees at stores to which the salesmen delivered their products.

On the following Monday, of eleven drivers four elected to go franchise, three rejected and four were undecided. One reason for objection to the franchise plan was concern over a possible financial loss and inquiry was made about the possibility of including in the franchise agreement a guaranteed minimum income and Ellis agreed to consider the same.

January 12th a meeting was called by the Union of the driver-salesmen to counter the Company proposition. After a general discussion among the ten drivers present and union officials, a secret ballot was taken on whether they would allow the Union to represent them in getting another collective bargaining agreement. The vote was 10–0 in favor of the Union. From accounts of this meeting it appears that the franchise agreement

was represented in a very unfavorable light by union representatives and further, the men were told that the Union could not represent men who signed the franchise contracts, that the only way the Union could represent the men was if it represented the entire group; that it was impossible to represent the men on individual contracts and a withdrawal card would be issued to anyone who signed the franchise agreements.

The following morning, Bowers, Union Secretary-Treasurer, who had attended the meeting of the previous evening, advised Ellis that the driver-salesmen had voted 10–0 to continue as driver-salesmen and to be represented by the Union in negotiations.

Ellis thereupon asked all drivers to meet in his office that afternoon. Again the subject of a possible financial loss was brought up and Ellis advised the men that the Company was willing to write into the franchise a weekly guarantee. With this concession several of the men who were undecided agreed to accept a franchise. Introduced into evidence was the agreement, signed by seven men, to accept a franchise from the Company.

A day or two later, in a conversation between Ellis and Bowers, Ellis was asked if he would negotiate and Ellis said he would for the employees—those who did not go on franchise—and Bowers said that he would not negotiate except for everybody.

January 21st a meeting was called by Ellis of the men who had accepted franchises for the purpose of determining how they stood with the Union. Each of the seven men signed an instrument revoking union authorizations previously given.

There were two final meetings between the parties. The afternoon of January 27th Ellis attended a meeting, as summoned, with the Joint Council of the Los Angeles Federation of Labor, at which time Ellis told the council that the Company would negotiate with the Union for the men who had not accepted fran-

chises, but he did not know whether or not it could for those who had accepted franchises and further that it was his opinion that the Union no longer represented a majority of the men. Bowers again took the position that he would negotiate for everybody or nobody and delivered an ultimatum that he would give Ellis until the following Sunday to advise him that he would negotiate for the entire organization. Ellis did not and pickets were placed at Servette's place of business and driver-salesmen who had not accepted a franchise went on strike.

■ This Court is in accordance with the Trial Examiner in his concluding Findings resulting in the conclusion that the General Counsel failed to establish by a preponderance of evidence that the company violated section 8(a) (5) of the Act in any respect.

■ The Company's decision to adopt the franchise method was brought about because of financial losses under the driver-salesmen system and the change was planned to coincide with the expiration date of the contract between the Union and the Company, and the Union was duly notified, prior to the time plans were completely made for the change. At meetings between Union officials and Company officers no objections were made to the company's plans. We agree with the trial examiner that reasonable notice of the anticipated change was given and as to the alleged refusal to bargain no official of the union ever requested or sought an opportunity to bargain. The factual situation in the instant case is clearly distinguishable from that in N. L. R. B. v. Brown-Dunkin Co., Inc., 287 F.2d 17 (10th Cir., 1961), cited by Petitioner.

■ There is no argument but what a company in the position of Respondent here may change its business methods so long as its change in operation is not motivated by the illegal intention to avoid its obligations under the Act. N. L. R. B. v. Houston Chronicle Pub. Co., 211 F. 2d 848, at 851 (5th Cir., 1954) citing

Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624; N. L. R. B. v. Union Pacific Stages, 9 Cir., 99 F.2d 153; N. L. R. B. v. Grace Co., 8 Cir., 184 F.2d 126. In N. L. R. B. v. Houston Chronicle Pub. Co., supra, the Court says further: "The issue is not whether the business reasons advanced by the respondent were good or bad, but whether the respondent actually in good faith had business motives for the change, or whether the change was illegally motivated."

This Court is of the opinion that the evidence clearly shows an adequate business motive for the change. Experience in their other locations showed the franchise arrangement to be more profitable for both the company and the men involved.

We are unable to agree with the Board's finding that the status of the drivers was at all times that of employees. The franchise contracts, we feel, were such that they made independent contractors of the drivers involved. We think the situation in this case falls within the standards applied in the case of Shamrock Dairy, Inc., 124 N.L.R.B. 494 (1959) and 119 N.L.R.B. 993 (1957), wherein it is stated at 1005:

"Congress intended that the Board recognize as employees those who 'work for wages or salaries under direct supervision,' and as independent contractors those who 'undertake to do a job for price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials and labor and what they receive for the end result, that is, upon profit."

Likewise, it is true in this case, as it was in Shamrock Dairy, Inc., supra, that some elements of the relationship suggest an employer-employee relationship, but taken overall, we feel that the drivers became independent contractors.

The Company at all times was willing to bargain with the Union for those driver-salesmen not on a franchise arrangement and continually communicated this willingness to the Union. Rather, the evidence shows that it was the Union, through its representative Bowers, who made meeting on any grounds between the Union and the Company impossible. Certainly, the evidence fails to show by a preponderance that the Company committed any unfair labor practices. We agree with the Trial Examiner's finding that the Union, through its representative Bowers, refused to even consider bargaining except on the basis of all the men, its old contract and its new proposals, refusing to even discuss the subject of franchise.

The Company discharged its obligation to bargain under the Act, and there was no violation by the Company of Section 8(a) (5) or of Section 8(a) (1) of the Act under the specific acts alleged.

For these reasons we would decline to enforce the Order of the National Labor Relations Board and it is so ordered.