322 F.2d 411
 EAST BAY UNION OF MACHINISTS, LOCAL 1304, UNITED STEELWORKERS OF AMERICA, AFL-CIO, and United Steelworkers of America, AFL-CIO, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Fibreboard Paper Products Corporation, Intervenor.
FIBREBOARD PAPER PRODUCTS CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL-CIO, and United Steelworkers of America, AFL-CIO, Intervenors.
 No. 17275.
 No. 17468.
 United States Court of Appeals District of Columbia Circuit.
 Argued April 29, 1963.
 Decided July 3, 1963.
 Petitions for Rehearing Before the Division Denied September 27, 1963.
 Petition for Rehearing En Banc Denied September 27, 1963.
 
 Mr. Jerry D. Anker, Washington, D. C., with whom Messrs. David E. Feller, Elliot Bredhoff, and Michael H. Gottesman, Washington, D. C., were on the brief, for petitioners in No. 17275 and intervenors in No. 17468.
 Mr. Marion B. Plant, San Francisco, Cal., with whom Mr. Gerard D. Reilly, Washington, D. C., was on the brief, for petitioner in No. 17468 and intervenor in No. 17275.
 Mr. Melvin J. Welles, Washington, D. C., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Stuart Rothman, Gen. Counsel at the time of argument, Dominick L. Manoli, Assoc. Gen. Counsel, and Marcel Mallet-Prevost, Assistant General Counsel, N. L. R. B., were on the brief, for respondent. Mr. Herman Levy, Atty., N. L. R. B., also entered an appearance for respondent.
 Before DANAHER, BASTIAN and BURGER, Circuit Judges.
 BURGER, Circuit Judges.
 
 
 1
 These are consolidated petitions for review of an order of the National Labor Relations Board. Cross motions for intervention have been granted. In response, the Board seeks enforcement of its order.
 
 
 2
 Fibreboard Paper Products Corporation, petitioner in No. 17468, is engaged in the manufacture, sale and distribution of paint, industrial insulation, floor covering and related products, operating twenty plants in five states. East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL-CIO, petitioner in No. 17275, until the events described below, had been the exclusive bargaining agent of the unit of maintenance employees at Fibreboard's Emeryville, California, plant.[1] The Union and the Company had had a history of collective bargaining dating from 1937. At the time of the events relevant to this case, the parties had a one year collective bargaining agreement terminating July 31, 1959. The contract provided for automatic renewal for another year unless one of the contracting parties gave sixty days notice of a desire to modify or terminate the contract. On May 26, 1959, the Union gave such a notice and sought to arrange a bargaining session with Company representatives. The Company was not cooperative in arranging a meeting and the representatives of the Company and the Union did not meet until July 27.
 
 
 3
 During the period when the Union was seeking to negotiate a new contract, the Company was considering contracting out its maintenance work to an independent contractor. By July 27, four days before the end of the contract term and approximately two months after the Union's notice, the Company had decided to contract out all its maintenance work then being performed by 73 men. A meeting with representatives of the Union was arranged the afternoon of that day. At this meeting the Union agents were handed copies of a letter from the Company which stated in pertinent part:
 
 
 4
 "For some time we have been seriously considering the question of letting out our Emeryville maintenance work to an independent contractor, and have now reached a definite decision to do so effective August 1, 1959.
 
 
 5
 "In these circumstances, we are sure you will realize that negotiation of a new contract would be pointless. However, if you have any questions, we will be glad to discuss them with you.
 
 
 6
 No negotiations were attempted during the remainder of that meeting. On July 30 another meeting was held at the Union's request for the purpose of bargaining about a new contract. At that time the Company representatives restated their position that they were not prepared to negotiate with the Union on the question. On July 31, the employment of the 73 maintenance workers, including 50 represented by the Union, was terminated and employees of the subcontractor went on the job.
 
 
 7
 The Union filed charges against the Company and the Board's Regional Director issued a complaint alleging violations of Section 8(a) (1), 8(a) (3) and 8(a) (5) of the Labor Act. 29 U.S.C. §§ 158(a) (1), 158(a) (3), 158(a) (5). Hearings were held and the Trial Examiner filed his Intermediate Report recommending dismissal of the complaint. The Board accepted the Examiner's recommendations and dismissed the complaint. 130 NLRB 1558. The General Counsel and the charging Union filed petitions for reconsideration which were granted. On reconsideration, the Board modified its original decision to the extent of finding that the Company had violated Section 8(a) (5) "by unilaterally subcontracting its maintenance without bargaining with the * * * [Union] over its decision to do so." The Board issued an appropriate cease and desist order in light of its findings and in addition, affirmatively ordered the Company to restore its maintenance operations and offer reinstatement with back pay to the displaced employees. The Board ordered that back pay be calculated from the date of the Board's supplemental decision and order to the date of the Company's offer of reinstatement to the employees in question. The Supplemental Decision and Order did not modify the original decision with respect to the dismissal of the charges under 8(a) (1) and 8(a) (3). 138 NLRB No. 67.
 
 
 8
 In its petition for review, the Company argues that (a) it had no duty to bargain about its decision to contract out the maintenance work performed by a unit of approximately 73 employees; and (b) there was no appropriate finding that it refused to bargain about its decision to contract out and that any such finding would not be supported by substantial evidence on this record. The Union challenges (a) the Board's failure to find a violation of Section 8(a) (3) and (b) the Board's failure to make the remedial order of back pay operative to the date of termination of employment.
 
 
 9
 (1)
 
 
 10
 The record clearly shows that the Company met with the Union to announce that it had decided to contract out the maintenance work, and that it would not bargain on this decision. This position was consistent with the Company's belief that contracting out was exclusively a "management prerogative" about which it could take unilateral action without first bargaining to impasse with the Union. The Board's opinions indicate that a finding of refusal to bargain was made by the Board. There is substantial evidence to support the Board's conclusion that the Company refused to bargain.
 
 
 11
 (2)
 
 
 12
 The facts of this case present the situation where the implementation of a decision to contract out the maintenance work, prompted by economic motives, extinguished the entire collective bargaining unit by terminating the employment of all of the members in that unit. In its supplemental decision and order the Board held that Fibreboard was under a duty to bargain with the Union on the proposed subcontracting before it took unilateral action.
 
 
 13
 It is important to point out certain issues which are not raised by this appeal, in order to define the limits of the issue we are deciding. We are not asked to evaluate a proposal made by management during the course of bargaining to determine whether it relates to a mandatory subject of bargaining within the intendment of Section 8(d) of the Act, National Labor Relations Board v. Wooster Division of Borg-Warner, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), nor are we asked to evaluate unilateral action concerning conditions of employment taken during negotiations, National Labor Relations Board v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); we are not asked to evaluate the propriety of unilateral action taken after negotiations have reached an impasse, National Labor Relations Board v. Intercoastal Terminal Inc., 286 F.2d 954 (5th Cir., 1961), nor are we asked to resolve issues relating to the scope of an arbitration clause in a collective bargaining agreement, United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).
 
 
 14
 Here the Company did not acknowledge that collective bargaining was essential as a preliminary to terminating the employment of an entire bargaining unit, nor did the employer bargain to impasse before taking unilateral action of contracting out all of the plant's maintenance work. Thus we are faced with the employer's contention that he was under no legal duty to bargain with the Union prior to contracting out the maintenance work. If the employer had the right unilaterally to terminate the employment of all employees making up a bargaining unit by contracting out the work, there would, of course, be no point in bargaining for a renewal of the existing contract. The work performed by its former employees would be performed by employees of a subcontractor.
 
 
 15
 The purpose of imposing legal duties upon employers to meet and bargain with the representatives of employees is to create a structure of industrial self-government for a particular plant arrived at by consensual agreement between management and employees within the framework of the statute. See United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 580-581, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). By guaranteeing employee participation in decisions relating to wages, hours, terms and conditions of employment, Congress made a determination that this would create an environment conducive to industrial harmony and eliminate costly industrial strife which interrupts commerce.
 
 
 16
 In framing Section 8(d) of the Act, 29 U.S.C. § 158(d), Congress was incorporating the decisions of the Board and the Courts defining the duty to bargain collectively. The statutory definition of those subjects about which the parties were required to bargain was of necessity framed in the broadest terms possible: wages, hours, terms and conditions of employment. The use of this language was a reflection of the congressional awareness that the act covered a wide variety of industrial and commercial activity and a recognition that collective bargaining must be kept flexible without precise delineation of what subjects were covered so that the Act could be administered to meet changing conditions. Congress left it to the Board, in the first instance, to give content to the statutory language, subject to review by the courts. Richfield Oil Corp. v. National Labor Relations Board, 97 U.S.App.D.C. 383, 231 F.2d 717, 58 A.L.R.2d 833, cert. denied, 351 U.S. 909, 76 S.Ct. 695, 100 L.Ed. 1444 (1956).
 
 
 17
 The employer's contention in essence is that its unilateral action was justified because it was motivated solely by economic necessity and that the Board's rejection of the Union's Section 8(a) (3) claims shows the absence of any anti-union animus. But the Board's final conclusions do not rest on a basis of improper motivation. It is not necessary to find an anti-union animus as a predicate for a conclusion that the employer violated Section 8(a) (5) which commands good faith bargaining on wages, hours and terms and conditions of employment. It is enough that management's reasons for its proposal might have been deemed satisfactory by and have been acceptable to the Union. It is not necessary that it be likely or probable that the union will yield or supply a feasible solution but rather that the union be afforded an opportunity to meet management's legitimate complaints that its maintenance was unduly costly. By way of illustration: the union, after hearing management's side of the problem, might concede the justice of the claims and agree to invoke union discipline to increase productivity and reduce costs. Specifically it might proffer a six months trial period in which either productivity would be increased with the existing force of 73 men or maintained with a reduced force to effect the economies desired by management.[2] It has been so often pointed out that no citation is called for that the obligation to bargain is not an obligation to agree. The basic concepts underlying the Labor Management Relations Act call for utilization of joint efforts at the bargaining table as a substitute for labor strife.
 
 
 18
 Having in mind the broad powers conferred on the Board by Congress and our limited scope of review, we conclude on this record that the Board was warranted in its determination that the employer violated Section 8(a) (5) by refusing to bargain before terminating the employment of all the members of its maintenance force.
 
 
 19
 (3)
 
 
 20
 The General Counsel's case in support of the Section 8(a) (3) charge rested on proof of overt acts from which it sought to persuade the Board to draw inferences of anti-union animus. The evaluation of such evidence is a process peculiarly within the seasoned experience of the Board and we see no basis for disturbing its finding that no Section 8(a) (3) violation was proven.
 
 
 21
 (4)
 
 
 22
 Finally the Union challenges the Board's action in dating the back pay remedy only from the date of the Board's Supplemental Decision and Order. The Union relies on A. P. W. Products, Inc., 137 NLRB No. 7, enforced, 316 F.2d 899 (2d Cir., 1963). We think it sufficient to point out that in that case it was the Board which chose to modify its long-standing practice with regard to tolling of back pay between the Intermediate Report favorable to an employer and a subsequent reversal by the Board, and the Court of Appeals enforced the order. In the present case the Board has framed what it deems to be an appropriate remedy and we see no basis to depart from the general rule of allowing the Board wide latitude in shaping remedies. See National Labor Relations Board v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953); Phelps-Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); Virginia Electric & Power Co. v. National Labor Relations Board, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943).
 
 
 23
 The Board's order will be enforced.
 
 
 
 Notes:
 
 
 [1]
 The employees in the unit included maintenance mechanics, electricians and helpers, working foremen, firemen and engineers employed in the powerhouse, and the storekeeper in the central supply and storeroom
 
 
 [2]
 Paradoxically the employer concedes that it would have been interested in possible solutions which the union might have offered but its course of action foreclosed negotiation at the threshold