**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ADAMS DAIRY, INC., Respondent.**

**No. 17171.**

United States Court of Appeals Eighth Circuit.

Sept. 12, 1963.

Rehearings Denied Oct. 11, 1963.

Elliott Moore, Atty., N.L.R.B., Washington, D. C., for petitioner and Stuart Rothman, Gen. Counsel, N.L.R.B., Washington, D. C., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Washington, D. C., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., and Melvin J. Welles, Atty., N.L.R.B., Washington, D. C., were with him on the brief.

J. Leonard Schermer, St. Louis, Mo., for respondent. J. Leonard Schermer and Sylvan Agatstein, of Shifrin, Treiman, Agatstein & Schermer, St. Louis, Mo., and Jack Hasburgh, of Hillix, Hall, Hasburgh, Brown & Hoffhaus, Kansas City, Mo., were on the brief.

Before VOGEL, VAN OOSTERHOUT and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

This is a petition by the National Labor Relations Board seeking enforcement of its order issued against the respondent, Adams Dairy, Inc. The order is predicated upon the Board's finding that the company violated § 8(a) (5) and (1) of the National Labor Relations Act, insofar as it discharged its driver-salesmen and replaced them with independent contractors without first notifying and consulting with the employees' certified bargaining representative.

Adams Dairy, Inc., is in the business of processing and selling milk and other dairy products. Its sales are made exclusively to retail outlets, with A & P and Kroger purchasing about 80% of its products. Prior to February of 1960 these sales were accomplished through the use of both driver-salesmen employees and independent contractors. The driver-salesmen were utilized largely in the City and County of St. Louis, Missouri, with the independent distributors servicing areas in Illinois and outstate Missouri. During this period the company used 24 driver-salesmen and 10 independent contractors in the sales and delivery phase of its business. The independent contractors bought the products from Adams for re-sale to retailers while the driver-salesmen were paid a commission on each unit they sold. Since 1954 the Independent Wholesale Dairy Products Salesmen's Association (union) represented the driver-salesmen while Teamsters Local 603 was the bargaining agent for the "inside" employees.

The union negotiated three contracts with Adams, the first two covering the period from September 1, 1954, to September 1, 1959. During negotiations for the contracts, the union attempted un-

successfully to include a clause which would prevent Adams from selling employees' routes to independent contractors. In 1955 all driver-salesmen were given the opportunity to convert their routes into independent distributorships. None of them accepted the proposal. The union attempted at various times to include a clause in the contracts giving the driver-salesmen the right to commissions on "dockside" sales. This proposal was also rejected by Adams.

The third contract between Adams and the union became effective on September 1, 1959, and was to expire on September 1, 1962. During four meetings in July and August of 1959, held for the purpose of negotiating this contract, Adams expressed concern over the fact that rival milk companies had lower delivery costs and consequently were able to undersell them. Adams mentioned another dairy, Quality of O'Fallon, which was using independent contractors. During negotiations union again orally proposed the inclusion of a clause in the contract prohibiting further substitution of independent contractors on company routes. Such proposal was again rejected by Adams. A compromise as to commissions to be paid the driver-salesmen was reached and the contract was executed on August 24, 1959.

In November and December, 1959, Adams initiated a series of meetings to discuss the unfavorable competitive situation caused by the lower costs of other dairies. Under the 1959 contract, Adams paid its driver-salesmen one and a half cents commission per unit up to 80,000 units and one and one-quarter cents per unit over 80,000 units. The average earnings for the driver-salesmen were $14,495 a year for a work week averaging 30 to 38 hours per week. During negotiations for the 1959 contract, Adams had attempted to reduce its delivery cost to one cent per unit but was unsuccessful. Adams asked the union for recommendations it might have to alleviate the situation. The union expressed a willingness to cooperate in the lowering of delivery costs but claimed an inability to help because Adams did not make any specific requests. Adams claims that it asked the union to come up with a plan but that the latter never complied. The union did meet for the purpose of voting on a motion to reopen the contract for negotiations but the motion was unanimously defeated. It is undisputed that Adams at no time during these meetings or during the contract negotiations intimated that it planned to completely change over to independent contractors, although on February 13, 1960, the sales manager of Adams voluntarily informed one of the driver-salesmen that Adams was planning to negotiate a system of independent distributors on all routes but the transformation had been temporarily postponed.

On February 22, 1960, Adams completed negotiations for changing from driver-salesmen to independent contractors. Adams informed the union of the change-over and that all positions of driver-salesmen were terminated. Such discharge covered all of Adams' employees represented by the union. Adams paid the driver-salesmen so discharged one week's pay in lieu of "notice" plus all accumulated vacation pay.

The union thereafter filed a complaint with the National Labor Relations Board. A Trial Examiner heard the case on May 30 and June 1, 1960, and in his intermediate report of December 14, 1960, held that before subcontracting the delivery services to independent contractors, thereby terminating the driver-salesmen employees, it was the duty of the employer to negotiate concerning such decision. He found Adams in violation of §§ 8(a) (5) and (1), 8(d) and 8(a) (3) and (1) of the National Labor Relations Act.

An appeal was taken to the National Labor Relations Board and on June 25, 1962, (almost two and a half years after the termination of employment) the Board rendered its decision and issued the order for which it here seeks enforcement. The Board approved the Trial Examiner's findings except that it did not pass upon the § 8(d) and § 8(a) (3) and (1) violations since the scope of the

order did not necessitate it. The order included in its provisions that Adams offer to reinstate all driver-salesmen and make them whole for earnings lost as a result of their replacement.

Both the Trial Examiner and the Board in the instant case have exonerated Adams of any anti-union motivation in its decision to convert from an employee to a subcontracting method of selling and distributing its products. The Examiner's report as adopted by the Board states:

" * * * The record is devoid of anti-union statements or attitudes usually present where there is a strong opposition to unions by an employer. Nor is there any pattern of conduct which would support a finding that Respondent was hostile to labor organizations generally or to the Union in particular.

"Moreover, there is also evidence in support of Respondent's claim that the changeover from delivery by its own driver-salesmen to delivery by independent distributors had an economic motivation. It is undisputed that during the entire course of negotiations here relevant Respondent consistently complained of its delivery costs in relation to its competitors. * * * "

The Board insists, however, that the decision to terminate distribution through driver-salesmen was the subject of mandatory bargaining under the provisions of the National Labor Relations Act and that inasmuch as Adams did not negotiate, it was guilty of unfair labor practices despite its purely financial motivation.

The employer's contention is that the decision to eliminate its driver-salesmen and to contract out that phase of its business was purely managerial prerogative and not the subject of bargaining with the union. Thus the primary issue is presented.

■ The principle that the element of intent is a crucial factor in the determination of whether or not certain acts can be labeled as unfair labor practices under § 8(a) of the Act has recently been discussed by the Supreme Court in N. L. R. B. v. Erie Resistor Corp., 1963, 373 U.S. 221, at pages 227 through 230, 83 S. Ct. 1139, at pages 1144 through 1146, 10 L.Ed.2d 308:

"We think the Court of Appeals erred in holding that, in the absence of a finding of *specific* illegal intent, a legitimate business purpose is always a defense to an unfair labor practice charge. *Cases in this Court dealing with unfair labor practices have recognized the relevance and importance of showing the employer's intent or motive to discriminate or to interfere with union rights. But specific evidence of such subjective intent is 'not an indispensable element of proof of violation.'* Radio Officers v. Labor Board, 347 U.S. 17, 44 [74 S.Ct. 323, 98 L.Ed. 455]. 'Some conduct may by its very nature contain the implications of the required intent; the natural foreseeable consequences of certain action may warrant the inference. * * * The existence of discrimination may at times be inferred by the Board, for "it is permissible to draw on experience in factual inquiries." ' [Local 357] Teamsters Local v. Labor Board, 365 U.S. 667, 675 [81 S.Ct. 835, 6 L.Ed.2d 11].

"Though *the intent necessary for an unfair labor practice may be shown in different ways,* proving it in one manner may have far different weight and far different consequences than proving it in another. When specific evidence of a subjective intent to discriminate or to encourage or discourage union membership is shown, and found, many otherwise innocent or ambiguous actions which are normally incident to the conduct of a business may, without more, be converted into unfair labor practices. [National] Labor [Relations] Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 46 [57 S.Ct. 615, 81 L.Ed. 893] (discharging employees); Associated

Press v. [National] Labor [Relations] Board, 301 U.S. 103, 132 [57 S.Ct. 650, 81 L.Ed. 953]. (discharging employees); Phelps Dodge Corp. v. [National] Labor [Relations] Board, 313 U.S. 177 [61 S. Ct. 845, 85 L.Ed. 1271] (hiring employees). Compare [National] Labor [Relations]. Board v. Brown-Dunkin Co., [10 Cir.] 287 F.2d 17, with [National] Labor [Relations] Board v. Houston Chronicle Publishing Co., [5 Cir.] 211 F.2d 848 (subcontracting union work); and Fiss Corp., 43 N.L.R.B. 125 with Jacob H. Klotz, 13 N.L.R.B. 746 (movement of plant to another town). Such proof itself is normally sufficient to destroy the employer's claim of a legitimate business purpose, if one is made, and provides strong support to a finding that there is interference with union rights or that union membership will be discouraged. Conduct which on its face appears to serve legitimate business ends in these cases is wholly impeached by the showing of an intent to encroach upon protected rights. The employer's claim of legitimacy is totally dispelled.

"The outcome may well be the same when intent is founded upon the inherently discriminatory or destructive nature of the conduct itself. The employer in such cases must be held to intend the very consequences which foreseeably and inescapably flow from his actions and if he fails to explain away, to justify or to characterize his actions as something different than they appear on their face, an unfair labor practice charge is made out. Radio Officers v. Labor Board, supra. But, as often happens, the employer may counter by claiming that his actions were taken in the pursuit of legitimate business ends and that his dominant purpose was not to discriminate or to invade union rights but to accomplish business objectives acceptable under the Act. Nevertheless, his conduct *does* speak for itself—it *is* discriminatory and ∙it *does* discourage union membership and whatever the claimed overriding justification may be, it carries with it unavoidable consequences which the employer not only foresaw but which he must have intended. As is not uncommon in human experience, such situations present a complex of motives and preferring one motive to another is in reality the far more delicate task, reflected in part in decisions of this Court, of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct. This essentially is the teaching of the Court's prior cases dealing with this problem and, in our view, the Board did not depart from it." (Emphasis supplied.)

■■ As has been pointed out, the instant case specifically does not include direct or indirect motivation on the part of the employer to discriminate. The remaining test under Erie Resistor would be whether the very decision itself had, as its natural consequence, a discouragement of union membership and constituted an encroachment upon the vested rights of the employees. One is presumed to intend the natural consequences that result from his acts. Quite obviously, the natural consequences of the employer's decision here would be that the employees would be out of a job. Nevertheless, it cannot be said that such a consequence would naturally tend to discourage union membership. Union membership is not a guarantee against legitimate or justifiable discharge or discharge motivated by economic necessity. In Erie Resistor the Supreme Court held that even in the absence of a finding of specific illegal intent and notwithstanding the employer's claim that its action

was necessary in order to continue operations during a strike, it was a violation of § 8(a) of the Act to grant super-seniority to replacements for strikers and also to strikers who returned to work during the strike because "* * * super-seniority by its very terms operates to discriminate between strikers and non-strikers, both during and after a strike, and its destructive impact upon the strike and union activity cannot be doubted." No such situation exists in the instant case. Since Adams was found to lack any subjective illegal intent or discriminatory motive and since its decision to abandon a phase of its operation and distribute entirely through independent contractors did not constitute an objectively illegal result, it seems to us that the Board, by ignoring intent, motivation and natural consequences altogether, has not applied the proper standard in determining the "unfairness" of the respondent's decision to terminate the employment by change-over to independent contractors.

That the element of intent or motivation has frequently been considered the crucial test in similar unfair labor practice charges can best be exemplified by two of the cases the Supreme Court compared in Erie Resistor. Both, N. L. R. B. v. Brown-Dunkin, 10 Cir., 1961, 287 F.2d 17, and N. L. R. B. v. Houston Chronicle Publishing Co., 5 Cir., 1954, 211 F.2d 848, were situations in which the employer subcontracted a certain phase of its business which had formerly been performed by employees. In both cases the employer defended against the unfair labor charge on the basis that such move was dictated by business necessity and not motivated by any anti-union sentiment. In Brown-Dunkin, the Tenth Circuit enforced the Board's order based on unfair labor practices because it found that the change-over was not legally motivated as the employer claimed. The court stated at page 19 of 287 F.2d:

"* * * But the Company was free to subcontract the employees' work, thereby severing the employer-employee relationship, so long as the ·

subcontracting was not made a subterfuge or an easy device for evading the statutory obligations to bargain in good faith. *The crucial and decisive fact is whether, as the Board found, the work of the employees was subcontracted to another in order to evade the collective bargaining process.* The Company may not discontinue a part of an integrated operation merely because the employees engaged in the particular unit seek Union representation. *In circumstances like these, motivation becomes important, indeed decisive* and, again, permissible inferences from the established facts are crucial. * * *" (Emphasis supplied.)

In Houston Chronicle, the Fifth Circuit refused to enforce the Board's order based on an allegedly unfair labor practice when that court found that the Board's conclusion of illegal motivation was not based upon substantial evidence. In so holding, it stated at pages 851 and 855 of 211 F.2d:

"* * * The issue is not whether the business reasons advanced by the respondent were good or bad, but whether the respondent actually in good faith had business motives for the change, or whether the change was illegally motivated. * *

* * * * * *

"* * * If an ordinary act of business management can be set aside by the Board as being improperly motivated, then indeed our system of free enterprise, the only system under which either labor or management would have any rights, is on its way out, unless the Board's action is scrupulously restricted to cases where its findings are supported by substantial evidence, that is evidence possessed of genuine substance. In our opinion, this is not such a case."

The Supreme Court, in Erie Resistor, supra, in comparing Brown-Dunkin and Houston Chronicle, supra, said at page

227 of 373 U.S., 83 S.Ct. at page 1145, 10 L.Ed.2d 308:

"* * * When specific evidence of a subjective intent to discriminate or to encourage or discourage union membership is shown, and found, *many otherwise innocent or ambiguous actions which are normally incident to the conduct of a business may, without more, be converted into unfair labor practices. * * *"* (Emphasis supplied.)

We find no such element of conversion in the instant case. We conclude that the Board herein was not free to completely ignore the question of intent and declare an act as an unfair labor practice without first finding some illegal motivation or intent or discriminatory result that naturally followed therefrom. Recent cases applying that principle include N. L. R. B. v. Servette, Inc., 9 Cir., 1962, 313 F.2d 67, 70:

"There is no argument but what a company in the position of Respondent here may change its business methods so long as its change in operation is not motivated by the illegal intention to avoid its obligations under the Act. N. L. R. B. v. Houston Chronicle Pub. Co., 211 F.2d 848, at 851 (5th Cir., 1954) citing Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624; N. L. R. B. v. Union Pacific Stages, 9 Cir., 99 F.2d 153; N. L. R. B. v. Grace Co., 8 Cir., 184 F.2d 126."

In N. L. R. B. v. New England Web, Inc., 1 Cir., 1962, 309 F.2d 696, 700, the court, in holding that an employer has the right to close its plant without violating the provisions of the Act where the employer, in the exercise of legitimate and justified business judgment, concluded that such a step is either economically desirable or economically necessary, and in setting aside and refusing to enforce the Board's order, stated 309 F.2d at page 700:

"We start with the proposition that a businessman still retains the untrammeled prerogative to close his enterprise when in the exercise of a legitimate and justified business judgment he concludes that such a step is either economically desirable or economically necessary. This prerogative exists quite apart from whether or not there is a union on the scene. 'A company may suspend its operations * * * so long as its change in operations is not motivated by the illegal intention to avoid its obligations under the National Labor Relations Act. A change in operations motivated by financial or economic reasons is not an unfair labor practice under the Act.' N. L. R. B. v. Lassing, 284 F.2d 781, 783 (6th Cir., 1960), cert. den., 366 U.S. 909, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961). An ordinary act of business management cannot be set aside by the Board. National Labor Relations Bd. v. Houston Chronicle Pub. Co., 211 F.2d 848, 855 (5th Cir., 1954)."

In N. L. R. B. v. Rapid Bindery, Inc., 2 Cir., 1961, 293 F.2d 170, at page 174, the Second Circuit in granting enforcement of the Board's order insofar as it related to §§ 8(a) (1) and 8(a) (5) but denying enforcement as it related to § 8 (a) (3), stated:

"* * * The Board's position appears to be that a move by management when that move is required for sound business reasons is nevertheless an unfair labor practice if the move is accelerated or reinforced by contemporaneous employer differences with a union. This position is not supported by the language of the Act or by the decisional law interpreting that language. The subsection reads:

'§ 8(a) It shall be an unfair labor practice for an employer—

* * * * * *

'(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *'

"This language has been interpreted to mean that a change or discontinuance of the employer's business operations in order to avoid obligations imposed upon it by the National Labor Relations Act is a violation of the subsection. N. L. R. B. v. Brown-Dunkin Co., 10 Cir., 1961, 287 F.2d 17; N. L. R. B. v. E. C. Brown Co., 2 Cir., 1950, 184 F.2d 829. For example, in N. L. R. B. v. E. C. Brown Co., supra, we enforced an order directing an employer to rehire employees displaced by the formation of a second corporation. However, there the second corporation was an exact replica of the superseded entity.

"In those situations where a change or discontinuance of business operations is dictated by sound financial or economic reasons the courts have refused to find that § 8(a) (3) has been violated even though the employer action may have been accelerated by union activity. N. L. R. B. v. Lassing, 6 Cir., 1960, 284 F. 2d 781, certiorari denied 1961, 366 U.S. 909, 81 S.Ct. 1085, 6 L.Ed.2d 235; N. L. R. B. v. R. C. Mahon Co., 6 Cir., 1959, 269 F.2d 44; N. L. R. B. v. Houston Chronicle Pub. Co., 5 Cir., 1954, 211 F.2d 848. In Lassing an employer had been toying with the idea of terminating its own transportation of the gas it produced in favor of utilizing a common carrier for this purpose, and had determined that any further increase in costs would dictate such a move. A union demand for recognition of three of its drivers foreshadowed just such an increase. The discontinuance of private carriage in favor of common was not found to be violative of § 8 (a) (3). N. L. R. B. v. R. C. Mahon Co., supra, was a similar situation. There plant guards were discharged for reasons of economy and the employer hired an independent contractor to supply it with plant protection."

In supporting the conclusion that § 8(a) (5) had been violated, the court concluded 293 F.2d at page 176:

" * * * The decision to move was not a required subject of collective bargaining, as it was clearly within the realm of managerial discretion. However, once that decision was made, § 8(a) (5) requires that notice of it be given to the union so that the negotiators could then consider the treatment due to those employees whose conditions of employment would be radically changed by the move. Nothing affects conditions of employment more than a curtailing of work, and such a curtailment is properly the subject of collective bargaining." (Emphasis supplied.)

In denying enforcement of the Board's order, the Court of Appeals for the Sixth Circuit, in N. L. R. B. v. R. C. Mahon Co., 6 Cir., 1959, 269 F.2d 44, said at page 47:

"As to the principal question of the case the trial examiner recommended that the complaint be dismissed. He found since a program to curtail administrative expenses and overhead had been established in good faith before this situation arose and contracts had been solicited by independent companies offering plant protection, elimination of the plant guard department was properly made for financial reasons and did not constitute a violation of the Act. This ruling of the trial examiner was clearly correct. The case falls squarely within the doctrine announced by this court in National Labor Relations Board v. Adkins Transfer Company, Inc., 6 Cir., 226 F.2d 324. Cf. National Labor Relations Board v. Houston Chronicle Publishing Company, 5 Cir., 211 F. 2d 848; National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893.

*   *   *   *   *   *

"We find nothing in the National Labor Relations Act which forbids a company, in line with its plans for operation, to eliminate some division of its work."

In N. L. R. B. v. Adkins Transfer Co., Inc., 6 Cir., 1955, 226 F.2d 324, 327, the court stated:

"A company may suspend its operations or change its business methods so long as its change in operations is not motivated by the illegal intention to avoid its obligations under the Act."

See also N. L. R. B. v. Kingsford, 6 Cir., 1963, 313 F.2d 826, 828–831.

In the instant case we have a long history of negotiations between the employer and the union with reference to the union's desire to have a clause included in their contract preventing the employer from changing over from driver-salesmen employees to independent contractors, the refusal to so agree by the employer and the continuous complaint of the employer that its delivery costs were so high as to create an unfavorable competitive situation with reference to other dairies, plus the employer's request of the union for suggestions and cooperation regarding the lowering of delivery costs.

In Jays Foods, Inc. v. N. L. R. B., 7 Cir., 1961, 292 F.2d 317, the court refused the enforcement of the Board's order where the sole reason for the employer's abolishing its automobile repair shop was not discrimination against employees but to avert threatened economic loss and accordingly the employer's actions were found not to be a violation of the Act.

Cases relied on by the Board include its own case in Town & Country Mfg. Co., Inc., 136 N.L.R.B., No. 111, affirmed in Town & Country Mfg. Co., Inc. v. N. L. R. B., 5 Cir., 1963, 316 F.2d 846. The case is clearly not in point. The Fifth Circuit, in ordering the enforcement of the Board's order, stated at page 847 of 316 F.2d:

"The Board, earnestly insisting: that, whatever might be said with respect to the petitioner's contention that this part of the order intruded upon its unquestioned right of management, if the evidence in that respect were otherwise than it is, urges upon us that *the evidence is so overwhelming that the petitioner's action was motivated by anti-union sentiment and a desire to rid itself of the union, that it is quite clear in the state of the record that the Board's order, is unimpeachable and, therefore, within the intendment of all the cases, including National Labor Relations Board v. American National and National Labor Relations Board v. Houston Chronicle, supra, it should be enforced. We agree that this is so.*

"While it is true that the examiner found that the petitioner's conduct in this respect was not motivated by opposition to the union but was the result of action by the Interstate Commerce Commission and the petitioner's desire to conform thereto, and the dissenting member agreed with this conclusion, *we think it is clear that the evidence permits of no other reasonable conclusion than that the determination to subcontract its work and to discharge its drivers from employment was the result in part at least of the company's determination to rid itself of the union, and that the order of the Board should, therefore, be enforced throughout.*" (Emphasis supplied.)

The Board also relies upon Order of Railroad Telegraphers v. Chicago & N. W. Ry. Co., 1960, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774. That action was an attempt by the railroad to enjoin the union from striking over threatened abolishment of certain railroad stations. The Supreme Court determined that the strike involved a legitimate labor dispute and that such threatened action by the railroad plainly referred to conditions of

employment and the union's effort to negotiate did not represent an attempt to usurp legitimate managerial prerogative. That case has been distinguished on the basis that it involved the Railway Labor Act and that the decision to terminate there left employees in the bargaining union whose jobs could or would be affected by the decision. See Jays Foods, Inc. v. N. L. R. B., 7 Cir., 1961, 292 F.2d 317, 320, supra, and the Board's own decision in its first determination of Fibreboard Paper Products Corp., 1961, 130 N.L.R.B. 1558, 1561.[1]

That intent and motivation are still essential considerations in an unfair labor practice case is made clear by Erie Resistor which was, of course, decided subsequent to Telegraphers. It should also be noted that N. L. R. B. v. Kingsford, 6 Cir., 1963, 313 F.2d 826, 828–831; N. L. R. B. v. Servette, Inc., 9 Cir., 1962, 313 F.2d 67; N. L. R. B. v. New England Web, Inc., 1 Cir., 1962, 309 F.2d 692; N. L. R. B. v. Rapid Bindery, Inc., 2 Cir., 1961, 293 F.2d 170; Jays Foods, Inc. v. N. L. R. B., 7 Cir., 1961, 292 F.2d 317; N. L. R. B. v. R. C. Mahon Co., 6 Cir., 1959, 269 F.2d 44; and N. L. R. B. v. Adkins Transfer Co., Inc., 6 Cir., 1955, 226 F.2d 324, supra, and which we cite with approval here, were also decided subsequent to the Supreme Court's decision in Telegraphers.

■ We hold here that the decision on the part of Adams to terminate a phase of its business and distribute all of its products through independent contractors was not a required subject of collective bargaining. After that decision had been made, however, § 8(a) (5) did require negotiation with reference to the treatment of the employees who were terminated by the decision. The remedies fixed by the Board for failure to bargain concerning the decision on the part of

Adams to completely eliminate the distribution phase of its business are entirely too broad to fit the violation for failure to negotiate with reference to the treatment of employees who were thus terminated. In N. L. R. B. v. Rapid Bindery, Inc., 2 Cir., 1961, 293 F.2d 170, supra, the court followed this principle in modifying an order based upon an alleged unfair labor practice. The Board had found that the shut-down of one of the company's plants was motivated by union hostility. The Second Circuit said, however, at page 177 of 293 F.2d:

"* * * We hold that the move was motivated by sound economic reasons and it is our view that any obligation due to Rapid's employees will be fulfilled by offering them jobs at the Frontier plant in Tonawanda."

In the instant case there were no employees left in the bargaining unit whose jobs might be affected by the termination nor does the record indicate any jobs available to the displaced employees in other plants which might be owned by the respondent. There was, then, only the question of severance pay to which the discharged employees might be entitled. The collective bargaining agreement between the union and respondent outlined the procedure to be taken in the event a route or routes were to be discontinued or eliminated. Here all routes were eliminated. Since there was no bargaining on the subject, the agreement itself should be controlling. Such agreement, insofar as it relates to severance pay, provides:

"*Nothing herein* contained in this Article VII *shall prevent Employer from* enlarging, decreasing or altering the specified territory of any route nor shall the same prevent Employer from putting on, splitting, rearranging, consolidating or *eliminat-*

1. In a supplemental decision and order in 138 N.L.R.B. 550, the Board reversed itself, which reversal was affirmed July 3, 1963, by the Court of Appeals for the District of Columbia in Fibreboard Paper Products Corp. v. N. L. R. B., D.C.Cir., 322 F.2d 411. If the latter case can be considered as holding views contrary to those expressed herein, we find it unpersuasive.

*ing any route or routes* provided (1) Employer complies with the provisions of Article XII of this Agreement, and (2) provided Employer specifies within seven (7) days thereafter a specific route territory for each of Employer's established milk routes so affected." [2] (Emphasis supplied.)

The pertinent part of Article XII is as follows:

"Employer agrees not to consolidate or take off a route that is in commission on the points set forth under 'Method for Determining Points' unless a four (4) month guarantee of the employee's basic pay and commission is paid. However, the four (4) month guarantee provided by this Article shall terminate: (1) on the date a driver receiving a guarantee is awarded another job on a bid filed by him under the provisions of Article XIII; (2) on the date his employment as a regular route driver is changed; and (3) on the date driver's employment is terminated unless employee was discharged without cause."

Respondent here did not comply with the conditions of the bargaining agreement in that it arbitrarily gave the discharged employees only one week's pay plus accumulated vacation pay, rather than four months' pay under the provisions of Article XII.

The Board's proposed order is hereby modified to provide that respondent shall pay each of the affected employees the four months' basic pay and commission as provided for in Article XII of the agreement, less the one week's pay already distributed, plus interest on the additional amounts due at the rate of 6% per annum. In all other respects the enforcement of the Board's order is denied.

---

2. Proviso No. 2 could not possibly have any meaning in connection with the total elimination of all routes but it was still imperative for the employer to comply with the first proviso.