**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Esti NEIDERMAN and Gizela Eisner, individually and as co-partners d/b/a Star Baby Co., Respondents.**

**No. 455, Docket 28626.**

United States Court of Appeals Second Circuit.

Argued May 28, 1964.

Decided July 17, 1964.

Glen M. Bendixsen, N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, N.L.R.B., Washington, D. C., on the brief), for petitioner.

Benjamin Weberman, New York City, for Star Baby Co., respondent.

Before LUMBARD, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

LUMBARD, Chief Judge.

The National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act, petitions for enforcement of its order of January 18, 1963, 140 NLRB 678, directed against the respondents after the Board decided that the respondents (1) did not bargain in good faith with the union, Local 105, I.L.G.W.U., and solicited strikers to return to work with promises of benefit, thereby violating §§ 8(a) (5) and 8(a) (1) of the National Labor Relations Act, and (2) closed their business and discharged their employees, in violation of §§ 8(a) (3) and 8(a) (1) of the Act. We agree with the Board's decision only with respect to their finding that the respondents did not bargain in good faith and did solicit strikers to return to work and, therefore, we modify the order of the Board accordingly.

The events giving rise to the charges of violation of the Act are, briefly, as follows. Esti Neiderman and Gizela Eisner were co-partners doing business as Star Baby Co., manufacturers of kimonos and sleeping bags for infants on East Broadway in Manhattan. The five-year old business was in fact managed and supervised by Bernat Neiderman and Meyer Eisner, the husbands of the co-partners. Star Baby Co. employed 18 non-supervisory workers and in November of 1961, 12 of them applied for membership in the Snow Suit, Skiwear, Leggings and Infants Novelty Wear Workers' Union, Local 105, I.L.G.W.U., and authorized it to act as their exclusive representative for the purpose of collective bargaining. Harris Zinn, the union's business agent, accosted the Neidermans on the morning of November 22, in front of the Star Baby plant, and informed them that there were 12 workers seeking union representation and he therefore suggested that the Neidermans meet Martin Cohen, Manager of Local 105, to

discuss union representation. Mr. Neiderman indicated he was not interested in talking to anyone about unionization at that time. At Zinn's direction the 12 Star Baby employees then commenced picketing the premises of the plant. On the morning of the next day Zinn again spoke to Mr. Neiderman in front of the plant and Neiderman, again unwilling to discuss unionization, stated that he would not sit down with anyone to talk about how to run his business.

Seven days after the picketing had begun and all the operations of the plant had ceased, the Neidermans met with Martin Cohen. Cohen outlined the union's standard of wages and hours in the industry; Neiderman, however, would not discuss the steps necessary to implement any of these standards. During the first week in December Cohen and Neiderman met twice more. On these occasions Neiderman pointed out that Star Baby was "just beginning" in business and could not afford the additional costs that unionization would incur. Furthermore, he informed Cohen that his customers, in reply to inquiries made at the request of the union, had indicated to him that they would not purchase his product at a higher price. Dissatisfied with the talks with the Neidermans, the union, on December 14, petitioned the National Labor Relations Board for an election. Within a few days thereafter Mrs. Neiderman and Mrs. Eisner executed an agreement which dissolved the partnership and provided for the sale of the assets. On January 15 the last piece of equipment was moved from respondents' plant and the picketing ceased. So far as the record shows, the parties have not since engaged in this business.

■ We agree with the Board's findings that respondents violated §§ 8(a) (1) and 8(a) (5) of the Act by soliciting strikers to return to work with promises of higher wages. Mrs. Ayala, a former machine operator for Star Baby, testified that on November 29, after the strike at the plant had continued for about a week, Mr. Eisner approached her on the street where she lived. Mr. Eisner told her that he thought she was a leader among those who were striking and the company would increase her salary from $60 to $65 and they would also give pay increases to two of Mrs. Ayala's friends if Mrs. Ayala would break the strike. The respondents did not contradict this testimony, rather they argue that Mr. Eisner was neither an owner of Star Baby nor authorized as an agent to offer higher wages to break the strike. However, there is ample evidence that Mr. Eisner was a management spokesman and a supervisor under § 2 (11) of the Act; he directed and assigned the work in the plant and was consulted on the advisability of granting a pay raise. As a supervisor over a portion of the plant operations and husband of a co-owner, Mr. Eisner's activities are chargeable to the respondents. N.L.R.B. v. Syracuse Stamping Co., 208 F.2d 77, 79 (2 Cir. 1953); N.L.R.B. v. Champa Linen Service Co., 324 F.2d 28, 30 (10 Cir. 1963). The promise of a wage increase to Mrs. Ayala was designed to undermine the union's representative status and constituted an invasion of the employees' collective bargaining rights.

■ There is sufficient evidence to support the Board's finding that the respondents did not bargain in good faith. From the very first contact with a union representative, on November 22, 1961, Mr. Neiderman stated that he was not interested in bargaining with the union representative, notwithstanding that a majority of Star Baby's employees requested union representation, and that these employees, as stipulated, constituted a union appropriate for the purpose of collective bargaining within the meaning of § 9(b) of the Act. It is apparent that when the Neidermans did meet with officials of Local 105 on November 29 the respondents were simultaneously soliciting Mrs. Ayala to return to work in return for a wage increase. We agree with the trial examiner's conclusion, which was accepted by the Board, that this solicitation was not only a violation of § 8(a) (5) in itself but, "taken with Neiderman's statements both on November 22 and at his first meeting with the Union

on November 29 that he had 'plenty of time to think about meeting with the Union,' justifies the inference here drawn that when they did meet with Local 105 it was not for the purpose of bargaining in good faith * * *."

The Board found that the respondents discontinued their business operations to avoid bargaining with the union, thereby discharging their employees in violation of § 8(a) (3) of the Act. We disagree with the Board and agree with the trial examiner's finding that, notwithstanding respondents' failure to bargain in good faith, there is not enough evidence to support a holding that the termination of the respondents' business was primarily a result of an anti-union motive, or that it was an act of coercion against employees attempting to exercise their statutory rights. The respondents at no time threatened their employees with such action. To the contrary, there was uncontroverted evidence that the dissolution of Star Baby was for economic reasons. Esti Neiderman testified that the company could not raise its prices to permit observance of the union's standards and still compete profitably within their industry. The customers of Star Baby had indicated they would not pay a higher price for the kimonos and sleeping bags. The trial examiner found no reason to doubt this testimony, nor has the union presented any evidence disputing the respondents' claim that the dissolution of the business was primarily predicated on valid economic considerations. The Board's finding that Star Baby could have well afforded unionization was without satisfactory support. That the company's most recent season was an improvement over the past and, that one employee had recently been given a $2 salary increase by no means establishes that the company could afford unionization of the entire plant. We reverse the Board's determination that the closing of respondents' business violated § 8(a) (3) of the Act. Thus we do not reach consideration of the respondents' alternative argument that an employer has an absolute right to cease plant operations in toto, for any reason, without violating § 8. See Darlington Mfg. Co. v. N.L.R.B., 325 F.2d 682 (4 Cir. 1963), cert. granted, 32 U.S.L.Week 3368 (April 20, 1964).

Nor need we consider whether the decision to go out of business was a mandatory subject of bargaining and whether the respondents violated § 8(a) (5) of the Act by terminating their operations without discussing it with the union inasmuch as a bargaining violation has already been found under § 8(a) (5) and any determination of this issue would not alter the appropriate scope of the Board's order.

Having adjudged that there was a violation of § 8(a) (1) and (a) (5) of the Act, but that there was no violation of § 8(a) (3), we grant enforcement of the Board's order except as to those provisions enabling the employees to recover sums equivalent to the amounts they would have normally earned from January 15, 1962, the date on which the discharge of employees was effectuated, until such time as each employee secures, or did secure, substantially equivalent employment elsewhere.