## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## ADAMS DAIRY, INC., Respondent.

### No. 17171.

United States Court of Appeals
Eighth Circuit.

Sept. 8, 1965.

Norton J. Come, Asst. General Counsel, N.L.R.B., Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel and Laurence S. Gold, Attorney N.L.R.B., Washington, D. C., for petitioner.

J. Leonard Schermer, of Shifrin, Treiman, Agatstein & Schermer, St. Louis, Mo., Sylvan Agatstein, for Adams Dairy.

Harry H. Craig, Carroll C. Gilpin, St. Louis, Mo., for charging party as amicus curiae.

Before VOGEL, VAN OOSTERHOUT and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

On September 12, 1963, this court, on a petition from the National Labor Relations Board, denied enforcement of the Board's order in all respects save one.

National Labor Relations Board v. Adams Dairy, Inc., 8 Cir., 1963, 322 F.2d 553. The Board petitioned the Supreme Court for certiorari and on January 18, 1965, such petition was granted. Thereafter, by per curiam order, 379 U.S. 644, 85 S.Ct. 613, 13 L.Ed.2d 550 the prior judgment of this court was vacated and the case was remanded to us "for reconsideration in light of Fibreboard Paper Products Corp. v. Labor Board", 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233, decided by the Supreme Court subsequent to our opinion in Adams Dairy.

Upon remand, we directed that additional briefs be submitted and the case be reargued. That has been done. In our prior opinion, at page 562 of 322 F.2d, we said:

> "We hold here that the decision on the part of Adams to terminate a phase of its business and distribute all of its products through independent contractors was not a required subject of collective bargaining."

After consideration of the additional briefs filed by the parties, the oral arguments of counsel, and viewing this situation in the light of Fibreboard, as directed, we believe our original opinion to have been correct. We conclude that Adams Dairy is so factually distinguishable from Fibreboard as to take Adams Dairy outside the orbit of the Fibreboard holdings.

Fibreboard arose out of a dispute between the Fibreboard Paper Products Company and a union representing that company's maintenance employees. In September of 1958 the union and company had entered into the latest of a series of collective bargaining agreements which was to expire on July 31, 1959, upon 60 days' notice by either the union or the company. The union gave timely notice. The company delayed meeting with the union until July 27,

1959, at which time the union was informed that Fibreboard intended to "let out" the maintenance work to an independent contractor to save on costs. By July 30th the contractor had been secured on the basis of costs of the operation plus a fixed fee of $2,250 per month. The union was told that in view of the hiring of the contractor, a new agreement negotiation session would be futile and none was had. Fibreboard was charged with violations under §§ 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act and a violation was upheld under § 8(a)(5).[1] The facts in the Adams Dairy case are fully and adequately set out in our prior opinion. At this point it is only necessary to say that Adams Dairy was not found by this court to be in violation of §§ 8(a)(5) and (1) of the National Labor Relations Act by neglecting to bargain with the employees' certified union bargaining representative, the Independent Wholesale Dairy Products Salesmen Association, when discharging their driver-salesmen and replacing them with independent contractors.

As a preliminary matter to the further comparison of these two cases, we point out that the Supreme Court, in Fibreboard, carefully limited its decision to the facts presented in that case. At page 209 of 379 U.S., at page 402 of 85 S.Ct., Mr. Chief Justice Warren, who wrote the majority opinion, stated:

> " * * * We agree with the Court of Appeals that, *on the facts of this case,* the 'contracting out' of the work previously performed by members of an existing bargaining unit is a subject about which the National Labor Relations Act requires employers and the representatives of their employees to bargain collectively." (Emphasis supplied.)

---

1. Under this section, "It shall be an unfair labor practice for an employer— * * * (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [of this Act]." Under § 9 (a) collective bargaining is required as to " * * * rates of pay, wages, hours of employment, or other conditions of employment * * *."

At page 215 of 379 U.S., at page 405 of 85 S.Ct., the opinion continues:

"We are thus not expanding the scope of mandatory bargaining to hold, as we do now, that the type of 'contracting out' involved in this case—the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining under § 8(d). *Our decision need not and does not encompass other forms of 'contracting out' or 'subcontracting' which arise daily in our complex economy.*" (Emphasis supplied.)

In footnote No. 8 on page 215 of 379 U.S., on page 405 of 85 S.Ct., the court states:

"As the Solicitor General points out, the terms 'contracting out' and 'subcontracting' have no precise meaning. They are used to describe a variety of business arrangements altogether different from that involved in this case. For a discussion of the various types of 'contracting out' or 'subcontracting' arrangements, see Brief for Respondent, pp. 13–17; Brief for Electronic Industries Association as *amicus curiae,* pp. 5–10."

In a separately concurring opinion, joined in by Mr. Justice Douglas and Mr. Justice Harlan, Mr. Justice Stewart pointed out at page 218 of 379 U.S., at page 407 of 85 S.Ct.:

" * * * The question posed is whether the particular decision sought to be made unilaterally by the employer in this case is a subject of mandatory collective bargaining within the statutory phrase 'terms and conditions of employment'. That is all the Court decides. *The Court most assuredly does not decide that every managerial decision which necessarily terminates an individual's employment is subject to the duty to bargain. Nor does the Court decide that subcontracting*

*decisions are as a general matter subject to that duty. The Court holds no more than that this employer's decision to subcontract this work, involving 'the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment' is subject to the duty to bargain collectively. Within the narrow limitations implicit in the specific facts of this case, I agree with the Court's decision.*" (Emphasis supplied.)

Thus the Supreme Court has not held that all forms of contracting out are subject to collective bargaining. For reasons set out below, we believe that the situation in Adams Dairy is so factually distinguishable from that in Fibreboard as to take Adams Dairy outside of the scope of the collective bargaining requirements.

Turning now to the cases themselves, we note, first, that the decision to contract out the maintenance work in Fibreboard did not change the basic operation of the company involved. The maintenance work was let out under a terminable contract on a cost-plus basis. The contractor performed the same work previously performed by company employees on company premises with company machines and equipment. The contractor was under the direct control of the company. The company directly enjoyed the benefits of the contractor's work. As stated by the Supreme Court in Fibreboard, at page 213 of 379 U.S., at page 405 of 85 S.Ct.:

"The facts of the present case illustrate the propriety of submitting the dispute to collective negotiation. *The Company's decision to contract out the maintenance work did not alter the Company's basic operation. The maintenance work still had to be performed in the plant. No capital investment was contemplated; the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employ-*

*ment.* Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business." (Emphasis supplied.)

The separately concurring opinion states at page 219 of 379 U.S., at page 407 of 85 S.Ct.:

" * * * Maintenance work continued to be performed within the plant, with the work ultimately supervised by the company's officials and 'functioning as an integral part' of the company. Fluor was paid the cost of operations plus $2,250 monthly. The savings in costs anticipated from the arrangement derived largely from the elimination of fringe benefits, adjustments in work scheduling, enforcement of stricter work quotas, and close supervision of the new personnel. Under the cost-plus arrangement, Fibreboard remained responsible for whatever maintenance costs were actually incurred. * * * "

In Adams Dairy, on the other hand, a basic operational change did take place when the dairy decided to completely change its existing distribution system by selling its products to independent contractors. After the decision was made by the dairy to sell its products dockside to independent distributors, all of the trucks used previously by driver-salesmen were sold to independent distributors. Adams Dairy did not finance the sale, nor in any way arrange for such financing. The routes driven by the independent distributors, though covering a similar territory, did not correspond to the previous routes of the driver-salesmen. The independent distributors took title to the products at dockside and Adams, thereafter, legally had no concern with what was done with the products. The distributors were solely responsible for selling the products. The work done by the independent contractors, contrary to the situation in Fibreboard, was not primarily performed in the Adams plant for the benefit of the dairy. Adams was not directly con-

cerned with whether or not any given distributor sustained a profit or loss, as would have been the situation with the driver-salesmen. The only major restrictions that Adams placed upon the independent distributors by contract related to sanitation matters and to the maintenance of high products standards and the maintenance of good will.

Contrary to the situation in Fibreboard, then, there is more involved in Adams Dairy than just the substitution of one set of employees for another. In Adams Dairy there is a change in basic operating procedure in that the dairy liquidated that part of its business handling distribution of milk products. Unlike the situation in Fibreboard, there was a change in the capital structure of Adams Dairy which resulted in a partial liquidation and a recoup of capital investment. To require Adams to bargain about its decision to close out the distribution end of its business would significantly abridge its freedom to manage its own affairs. Bargaining is not contemplated in this area under the history and usage of § 8(a) (5). N. L. R. B. v. Neiderman, 2 Cir., 1964, 334 F.2d 601; Jays Foods, Inc. v. N. L. R. B., 7 Cir., 1961, 292 F.2d 317; N. L. R. B. v. R. C. Mahon Co., 6 Cir., 1959, 269 F.2d 44. It was specifically found that there was no anti-union animus present in Adams Dairy. In the exercise of what it considered to be good judgment, Adams decided to cease its distribution business and to sell its products to independent distributors. There is no comparability between Fibreboard and Adams Dairy in this area and the Supreme Court could not say of the Adams Dairy situation what it said in Fibreboard at page 213 of 379 U.S., at page 404 of 85 S.Ct.:

" * * * Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business."

Since the Supreme Court's decision in Fibreboard, it has handed down a more recent opinion in Textile Workers Union of America v. Darlington Mfg. Co.,

March 29, 1965, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827, which we believe lends support for our contentions here on reconsideration. Therein a majority of the stock of Darlington Manufacturing Company was owned by Deering Milliken & Company, a marketing corporation which the National Labor Relations Board found was controlled by Roger Milliken, Darlington's president, and members of his family. Darlington was part of a single, integrated employer group controlled by the Milliken family through Deering Milliken. This group operated 17 textile companies with 27 mills. An organizational campaign by the union in Darlington was successful, although strongly resisted by Darlington through such methods as threatening to close the mill. Thereafter the Darlington company was liquidated, the plant closed and the equipment sold. The Board found that the closing was due to Roger Milliken's anti-union animus, a violation of § 8(a) (3) of the National Labor Relations Act, and, alternatively, that since the company was part of a single, integrated employer group, that Deering Milliken Company could be held liable for Darlington's unfair labor practice in closing part of its business for discriminatory purposes. The Court of Appeals had held, 4 Cir., 325 F.2d 682, that even assuming Deering Milliken was a single employer, it had the right to terminate all or part of its business regardless of anti-union motives and by a split decision denied enforcement of the Board's order. On appeal, the Supreme Court said at pages 273–276 of 380 U.S., at pages 1001, 1002 of 85 S.Ct.:

"* * * We hold here only that when an employer closes his entire business, even if the liquidation is motivated by vindictiveness toward the union, such action is not an unfair labor practice.

\* \* \* \* \* \*

"* * * On the other hand, a discriminatory partial closing may have repercussions on what remains of the business, affording employer leverage for discouraging the free exercise of § 7 rights among remaining employees of much the same kind as that found to exist in the 'runaway shop' and 'temporary closing' cases. See supra, p. 272 [85 S.Ct. p. 1001]. Moreover, a possible remedy open to the Board in such a case, like the remedies available in the 'runaway shop' and 'temporary closing' cases, is to order reinstatement of the discharged employees in the other parts of the business. No such remedy is available when an entire business has been terminated. By analogy to those cases involving a continuing enterprise *we are constrained to hold, in disagreement with the Court of Appeals, that a partial closing is an unfair labor practice under § 8(a) (3) if motivated by a purpose to chill unionism in any of the remaining plants of the single employer and if the employer may reasonably have foreseen that such closing would likely have that effect.* (Emphasis supplied.)

"While we have spoken in terms of a 'partial closing' in the context of the Board's finding that Darlington was part of a larger single enterprise controlled by the Milliken family, we do not mean to suggest that an organizational integration of plants or corporations is a necessary prerequisite to the establishment of such a violation of § 8(a) (3). If the persons exercising control over a plant that is being closed for anti-union reasons (1) have an interest in another business, whether or not affiliated with or engaged in the same line of commercial activity as the closed plant, of sufficient substantiality to give promise of their reaping a benefit from the discouragement of unionization in that business; (2) act to close their plant with the purpose of producing such a result; and (3) occupy a relationship to the other business which makes it realistically foreseeable that its employees will fear that such

business will also be closed down if they persist in organizational activities, we think that an unfair labor practice has been made out."

The court there reversed with instructions to remand the case to the Board for further proceedings with respect to employees of other plants owned by the same persons or connected with Darlington. We have no such situation in this case. Primarily, no union animus was shown. Accordingly, this being only a partial closing, unstimulated by union animus, having its motivation based solely in economics of operation, and not being a substitution of one set of employees for another but an entire and independent operation, we reaffirm our statements made in the original Adams Dairy case.

Even if the partial liquidation of Adams involved herein could be held subject to collective bargaining, it is arguable that such bargaining actually took place, which was certainly not the situation in Fibreboard. This argument is borne out through a further comparison of some of the factual differences between Adams Dairy and Fibreboard.

It should first be noted that the decision by Adams to liquidate its distribution system and to sell to independent contractors came at a time when the labor-management contract in force still had two years to run. The contract had become effective on September 1, 1959, and was not to expire until September 1, 1962. The alleged unfair labor practice arose in February of 1960. Thus just because the issue of independent distributors had not been negotiated in February of 1960 does not mean that the issue had not been negotiated before the current contract had been entered into. The facts yield the implication that, in fact, such negotiation had taken place. This being so, we feel that Adams would not be required to reopen negotiations during the contract period. In Fibreboard, on the other hand, the unfair labor practice charge arose during negotiations for a new labor-management contract and thus there was little or no excuse for not negotiating the disputed issue during current bargaining sessions. In Fibreboard, the Court of Appeals for the District of Columbia, Fibreboard Paper Products Co. v. N. L. R. B., 1963, 116 U.S.App.D.C. 198, 322 F.2d 411, said at page 412:

> "During the period when the Union was seeking to negotiate a new contract, the Company was considering contracting out its maintenance work to an independent contractor. By July 27, four days before the end of the contract term and approximately two months after the Union's notice, the Company had decided to contract out all its maintenance work then being performed by 73 men." (Emphasis supplied.)

The 1959 contract in Adams Dairy was the third one between the parties since 1954, the other two having expired. During the negotiations for all three of these contracts the union attempted, unsuccessfully, to include a clause which would have prevented Adams from, in effect, selling employees' routes or parts thereof to independent contractors or which would require Adams to reimburse the driver-salesmen for commissions lost through dockside sales of products used or distributed in their territories. During negotiations for the last contract in July and August of 1959 Adams expressed concern over the fact that rival milk companies had lower delivery costs and were able to undersell Adams. The union again orally proposed the inclusion of a clause in the contract prohibiting further substitution of independent contractors on company routes serviced by them. This proposal was again rejected by Adams. The contract was executed on August 24, 1959, without the union obtaining the desired clause.

During November and December 1959, after implementation of the last contract, Adams initiated a series of meetings with the union for the purpose of discussing the unfavorable competitive situation it found itself in due to lower delivery costs of other dairies. Adams asked the union for recommendations that it might have

with regard to lowering delivery costs. The union expressed an interest in cooperating but claimed an inability to help because Adams did not make any specific requests, even though during negotiations for the 1959 contract Adams had attempted, unsuccessfully, to reduce its delivery costs by reducing the commission rate of the driver-salesmen. Adams claims that it asked the union to come up with a plan, and that the latter never complied with this request. The union did meet for the purpose of voting on a motion to reopen the contract for negotiations, but the motion was unanimously rejected.

The present contract discussions and the November-December meetings would certainly come under the heading of negotiation and consultation and these negotiations were arguably "bargaining" as required under § 9(a), even though the union did not get what it desired. As stated by the Supreme Court in N. L. R. B. v. Insurance Agents' International Union, AFL–CIO, 1960, 361 U.S. 477, 485–486, 80 S.Ct. 419, 425, 4 L.Ed.2d 454:

"* * * Collective bargaining, then, is not simply an occasion for purely formal meetings between management and labor, while each maintains an attitude of 'take it or leave it'; it presupposes a desire to reach ultimate agreement, to enter into a collective bargaining contract. See Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309. This was the sort of recognition that Congress, in the Wagner Act, wanted extended to labor unions; recognition as the bargaining agent of the employees in a process that looked to the ordering of the parties' industrial relationship through the formation of a contract. See Local 24 of International Brotherhood of Teamsters, etc. v. Oliver, 358 U.S. 283, 295, 79 S.Ct. 297, 3 L.Ed.2d 312.

"But at the same time, Congress was generally not concerned with the substantive terms on which the parties contracted. Cf. Terminal Railroad Assn. [of St. Louis] v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 6, 63 S.Ct. 420, 87 L.Ed. 571."

There is no evidence that collective bargaining, as traditionally understood, did not take place on the matters in dispute in this case.

The Board argues:

"* * * Moreover, at no time in the negotiations did the Company suggest that it contemplated changing its method of distribution so as to replace all its driver-salesmen with independent distributors; * * *."

Even accepting this contention, it appears clear to us if Adams Dairy had ever stated to the union during negotiations that unless the company received a reduction in the wages of driver-salesmen it would eliminate all drivers by selling the distribution business to independent contractors, that this might well constitute coercive behavior. In Textile Workers v. Darlington Mfg. Co., 1965, 380 U.S. 263, 85 S.Ct. 994, supra, the Supreme Court said at footnote No. 20 on page 274 of 380 U.S., on page 1001 of 85 S.Ct.:

"Nothing we have said in this opinion would justify an employer's interfering with employee organizational activities by threatening to close his plant, as distinguished from announcing a decision to close already reached by the board of directors or other management authority empowered to make such a decision. * * *"

However, at all times Adams did make it clear to the union that the company regarded the terms of the contracts excessive. In light of the fact that some subcontracting had already been done (there were 10 independent contractors buying their dairy products dockside and 24 driver-salesmen at the time Adams entirely terminated the distribution end of its business), the union must have

recognized that an entire system of independent contractors was a possible alternative. In fact, it is significant that the 1959 contract itself provided the procedures to be taken in the event route or routes were to be discontinued or eliminated. The agreement provided:

"Nothing herein contained in this Article VII *shall prevent Employer from* enlarging, decreasing or altering the specified territory of any route nor shall the same prevent Employer from putting on, splitting, rearranging, consolidating or *eliminating any route or routes* provided (1) Employer complies with the provisions of Article XII of this Agreement, and (2) provided Employer specifies within seven (7) days thereafter a specific route territory for each of Employer's established milk routes so affected." (Emphasis supplied.)

Although proviso No. 2 could not possibly have any meaning in connection with the total elimination of all the routes, it was still imperative for the employer to comply with the first proviso. Article XII provides that:

"Employer agrees not to consolidate or take off a route that is in commission on the points set forth under 'Method for Determining Points' unless a four (4) month guarantee of the employee's basic pay and commission is paid. However, the four (4) month guarantee provided by this Article shall terminate: (1) on the date a driver receiving a guarantee is awarded another job on a bid filed by him under the provisions of Article XIII; (2) on the date his employment as a regular route driver is changed; and (3) on the date driver's employment is terminated unless employee was discharged without cause."

Thus merely by the fact provision was made for the termination of a route should have, and probably did, put the union on notice that rising costs might force Adams to replace all driver-salesmen with independent contractors.

 We reenter the same orders that followed our original determination of this case. In reaffirming our prior order relating to severance pay, we think it not remiss to point out that the penalties fixed by the Board for what it concluded to be a violation of §§ 8(a) (5) (1) were entirely too broad, excessive and unrealistic. We are told by counsel that Adams completely terminated all of its activities as of December 30, 1963, and that penalties up to that date under the Board's original order amounted to over three-quarters of a million dollars. If such remedies could continue up to the present time and until this litigation is finally and ultimately disposed of, the Board's penalties would become even more confiscatory and unjust.