470 F.2d 422
 81 L.R.R.M. (BNA) 2439, 152 U.S.App.D.C. 274,
69 Lab.Cas. P 13,070
 INTERNATIONAL UNION, UNITED AUTOMOBILE AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW and
its Local 864, UAW
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
General Motors Corporation, Intervenor.
 No. 71-1585.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 5, 1972.
Decided Oct. 17, 1972.
 
 Mr. Stephen I. Schlossberg, Detroit, Mich., with whom Messrs. John A. Fillion and Stanley Lubin, Detroit, Mich., were on the brief, for petitioners.
 Mr. Julius Rosenbaum, Atty., N. L. R. B., with whom Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., was on the brief, for respondent.
 Mr. Edmond J. Dilworth, Jr., Detroit, Mich., with whom Mr. Calvert Thomas, Detroit, Mich., was on the brief, for intervenor.
 Before BAZELON, Chief Judge, Justice CLARK,* of the Supreme Court of the United States, and WILKEY, Circuit Judge.
 Mr. Justice CLARK:
 
 
 1
 The question in this case involves the application of the rule in Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Specifically, is a decision made by a manufacturer to convert a selfowned and operated retail outlet into an independently owned and operated franchise dealership a decision subject to the mandatory bargaining requirement of Section 8(a)(5)[1] of the National Labor Relations Act, 29 U.S.C. Sec. 151 et seq.? The Trial Examiner answered the question in the affirmative. However The National Labor Relations Board, appellee, held that General Motors Corporation (GM), intervenor, was not required to so bargain and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), appellant appeals. We agree with the Board and deny the petition for review.
 
 
 2
 1. In addition to its manufacturing operations GM owns and operates various facilities engaged in the retail sales and servicing of GM trucks and truck parts. One of these facilities, which GM operated from the early 1960's until the inception of this case, was the Houston Truck Center in Houston, Texas. Since 1965 UAW has represented the employees at the Center under collective bargaining agreements effective through November 1970.
 
 
 3
 In early 1969, pursuant to an established corporate policy of disposing of factory-owned outlets, GM entered into negotiations for the sale of Houston Truck Center to Trucks of Texas, Inc., an independent dealership. Rumors of these negotiations reached UAW in April and union representatives insisted that they be kept informed of the matter and that GM and UAW bargain over it before the decision to sell was made. On May 21 the manager of the Center informed union representatives that a private party had made an offer for the Center but no sale had been consummated. He further advised that "there was no further reason to either discuss the item until such time as [GM] came to an agreement, or there was an occasion that it would be sold and that it would take place." On the following day, UAW filed this complaint with the Board.
 
 
 4
 On June 6, GM signed an agreement with Trucks of Texas, Inc. in which it subleased the premises and sold all personal property therein to Trucks for an undisclosed price. Simultaneously, GM awarded a dealership franchise for the sale of GM trucks to Trucks. The latter agreed to operate a full-line dealership at this location and promised to fulfill the truck warranty commitments of the Center. The "selling agreement" provided that if Trucks' dealership was terminated for any reason, either side could immediately terminate the sublease of the premises.
 
 
 5
 On June 9 Trucks of Texas distributed literature advising the employees that the facility had been sold and that the new management's "personnel requirements will be substantially different from those of your present employer," i. e. that no jobs were available for any of these employees. On the same date, a GM official distributed literature to the Center employees advising them of their eligibility for coverage under certain GM "benefit plans," of their separation rights, etc. and discussed their vacation pay and seniority date to be used in determining the benefits available to them. On June 10 and 11 he met with union representatives and discussed the effect of the sale to Trucks; he offered his personal assistance in locating employment in other GM facilities in the area; and made some concessions that were requested.
 
 
 6
 The Trial Examiner ordered that the status quo ante be restored. The Board reversed, finding that the transfer amounted to a "sale of the business" and was therefore beyond the terms of the mandatory bargaining requirement of Section 8(a)(5) since the decision was "at the core of entrepreneurial control." UAW seeks review of this decision.
 
 
 7
 2. Interestingly enough, both sides rely on Fibreboard Paper Products Corp. v. N. L. R. B., supra. As we read Fibreboard, however, it is a far cry from this case. In it maintenance work in a large manufacturing plant was contracted out upon the expiration of its collective bargaining with employees who had been performing the same work. The Court found that industrial experience illustrated that the contracting out of maintenance work had been brought within the collective bargaining framework; that it exists in numerous collective bargaining agreements and is the basis of many grievances, citing United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 584, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) and Local 24 Teamsters Union v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959). But UAW contends that Fibreboard should be read so as to require bargaining whenever a management decision results in termination of employment. The short answer to that is that Fibreboard itself declares: "The Company's decision did not alter the Company's operation . . . [T]o require the employer to bargain about the matter would not significantly abridge his freedom to manage the business . . . [379 U.S. at 213, 85 S.Ct. 398 at 404] We are thus not expanding the scope of mandatory bargaining." Id. 215, 85 S.Ct. 405. What UAW would have us do would turn over the management to it.
 
 
 8
 Our task is more than the mere parsing of the statutory language. We must make certain that "in each case the interests of the employees and the purpose of the National Labor Relations Act . . . be carefully balanced against the right of an employer to run his business." N. L. R. B. v. Royal Plating & Polishing Co., 350 F.2d 191, 195 (3 Cir. 1965).
 
 
 9
 In applying the case-by-case approach, the Courts of Appeals have looked to several factors to determine if a decision is one "primarily about the conditions of employment" or is instead "fundamental to the basic direction of a corporate enterprise." If the decision appears to be primarily designed to avoid the bargaining agreement with the union or if it produces no substantial change in the operations of the employer, the courts have required bargaining. International Union, U. A. W. v. N. L. R. B., 127 U.S. App.D.C. 97, 381 F.2d 265 (1967), cert. denied 389 U.S. 857, 88 S.Ct. 82, 19 L. Ed.2d 122 ["contracting out" of one step in a two-step car-parking operation previously done by union employees]; Weltronic Co. v. N. L. R. B., 419 F.2d 1120 (6 Cir. 1969), cert. denied, 398 U.S. 938, 90 S.Ct. 1841, 26 L.Ed.2d 270 [transfer of work from a union plant to a non-union plant three miles away]. If the decision resulted in the termination of a substantial portion or a distinct line of the employer's business or involved a major change in the nature of its operations, no bargaining has been required. N. L. R. B. v. Drapery Mfg. Co., 425 F.2d 1026, 1028 (8 Cir. 1970) [shut down of a drapery manufacturing division of a company involving "a major shift in capital investment" that was purely economically motivated]; N. L. R. B. v. Transmarine Navigation Corp., 380 F.2d 933 (9 Cir. 1967) [the operation of a terminal moved to another location with the company accepting minority interest in joint venture]; N. L. R. B. v. Royal Plating & Polishing Co., supra [one of two plants closed down]; see also N. L. R. B. v. Dixie Ohio Express Co., 409 F. 2d 10 (6 Cir. 1969) [procedures for loading and unloading substantially altered]; N. L. R. B. v. Adams Dairy, Inc., 322 F.2d 553 (8 Cir. 1963), remanded in light of Fibreboard, 379 U.S. 644, 85 S.Ct. 613, 13 L.Ed.2d 550 (1965), reaffirmed, 350 F.2d 108 (8 Cir. 1965), cert. denied, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 [change in distribution method]; Machinists v. Northeast Airlines 80 LRRM 2197 [airline merger]. The difficult cases have been those involving a small but not insubstantial proportion of the employer's business; in these cases, the results have often hinged on hints of anti-union animus. See, e. g., N. L. R. B. v. Johnson, 368 F. 2d 549 (9 Cir. 1966) [floor covering company decided to subcontract installation services immediately after the negotiation of a collective bargaining agreement]; N. L. R. B. v. American Manufacturing Co., 351 F.2d 74 (5 Cir. 1965) [subcontracting of truck delivery portion of business where a clear showing of animosity toward union is present].
 
 
 10
 3. The Board and GM contend that the transaction is a "sale" since the transfer calls GM the "seller" and Trucks the "buyer." UAW says it is only a franchise agreement because of the considerable interest GM retains in the operation to which Trucks succeeded. UAW emphasizes that GM may terminate Truck's dealership and cancel its sublease at any time; and, in addition, GM retains its marketing position in Houston at the same loacation. Thus, petitioner characterizes the arrangements as a "classical contracting out situation."
 
 
 11
 While GM's tagging of the contract as a sale is, of course, not decisive we believe that it was properly so characterized. It was succeeded by the execution of a standard GM dealership contract which was in keeping with a national GM policy to switch its remaining manufacturer-owned and operated retail outlets to independent franchises or dealerships. Such a decision is "fundamental to the basic direction of a corporate enterprise." It is at the core of entrepreneurial control. There is no claim here of anti-union bias on the part of GM and our action is not to be construed as foreclosing such a claim in an appropriate factual situation as our cases clearly show. We therefore find that GM was under no obligation to bargain before entering into this particular transaction.
 
 
 12
 4. UAW also contends that GM failed to bargain about the effects of the decision. We cannot agree. We need not repeat the efforts of the GM official on the very day of the transfer and the two succeeding days as well to work out the problems of the employees. It is sufficient to add that UAW itself used the opportunity to good advantage. A single problem raised by UAW transfers was the sole issue not settled to its satisfaction. And even as to it, Trucks' offer that it would undertake to secure employment for the UAW members at another location operated by an affiliate sparked no interest in the UAW.
 
 
 13
 The petition for review is denied.
 
 BAZELON, Chief Judge, dissenting:
 
 14
 This National Labor Relations Board decision announces and applies a rule automatically exempting "sales" of parts of businesses from the mandatory bargaining requirements of section 8(a)(5), 29 U.S.C. Sec. 158(a)(5) (1970).[1] I believe that this rule is inconsistent with the National Labor Relations Act.
 
 
 15
 The majority recognizes that our task is to apply the Supreme Court's decision in Fibreboard Paper Products Corp. v. NLRB.[2] There the Board held that an employer violated section 8(a)(5) by "subcontracting" cleaning work theretofore performed by its employees to an independent firm without bargaining about the action. Following earlier decisions[3] that held all matters within section 8(d)'s definition of "collective bargaining"[4] to be mandatory subjects of bargaining under section 8(a)(5), the Supreme Court found that dismissal of employees-a consequence of the decision to contract out the cleaning work-was a "condition of employment" within the meaning of section 8(d).
 
 
 16
 The Court was aware, however, that this approach might unacceptably sweep every managerial decision onto the bargaining table. Accordingly, it suggested some countervailing factors by specifying what was not involved in Fibreboard:
 
 
 17
 The facts of the present case illustrate the propriety of submitting the dispute to collective negotiation. The Company's decision to contract out the maintenance work did not alter the Company's basic operation. The maintenance work still had to be performed in the plant. No capital investment was contemplated; the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment. Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business.[5]
 
 
 18
 My brethren seem also to recognize[6] that the Supreme Court thus requires the Board to weigh the employees' interests protected by section 8(a)(5) against the effect bargaining will have on the employer's freedom to conduct his business.[7]
 
 
 19
 In the instant case the Board failed to make such an analysis. Rather, it began with the assertion that Fibreboard does not govern because the disputed transaction was a "sale," not a "subcontract." It then looked solely to what it perceived as management's interests in avoiding the strictures of bargaining over decisions to sell, justifying this approach with the unsupported assertion that "the courts" have adopted this rationale in "closely related cases:"
 
 
 20
 [D]ecisions such as this, in which a significant investment or withdrawal of capital will affect the scope and ultimate direction of an enterprise, are matters essentially financial and managerial in nature. They thus lie at the very core of entrepreneurial control, and are not the types of subjects which Congress intended to encompass within "rates of pay, wages, hours of employment, or other conditions of employment." [sic] Such managerial decisions ofttimes require secrecy as well as the freedom to act quickly and decisively. They also involve subject areas as to which determinative financial and operational considerations are likely to be unfamiliar to the employees and their representatives.[8]
 
 
 21
 Presenting nothing beyond these broad, and purely spculative, assertions, the Board held that, since the transaction here in question was a "sale," there was no duty to bargain about it. The Board did not determine the interests of this particular employer in avoiding bargaining over either this particular decision or the alleged general policy of disposing of its retail outlets; the Board similarly failed to take account of employee interests in bargaining, either in this particular case or in so-called "sales" cases generally. Thus, viewed as an application of Fibreboard, the Board's holding was that whenever an employer "sells" part of his operation, his interests in not bargaining about the decision always outweigh the interests of his employees in bargaining.
 
 
 22
 The Board may adopt an appropriate general rule governing the duty to bargain, but this one is unacceptable.[9] Whether a particular transaction constitutes a "sale" is a legal conclusion which defines the property rights of the parties to that transaction.[10] Even where Congress has explicitly attached additional consequences to that conclusion, as in income taxation, limitation and redefinition of the term have been deemed necessary because the interests involved differ.[11] And the term "sale" has not been incorporated into the National Labor Relations Act for good reason:[12] Whether an agreement constitutes a "sale" as a matter of property law may have little or nothing to do with the relative importance of the interests of management and employees in bargaining about the decision.
 
 
 23
 The approach of the Board in this case amply demonstrates this point. It based its holding that the instant transaction was a "sale" on four findings of fact: (1) the document used the words "buyer" and "seller;" (2) day-to-day management passed to the buyer; (3) title to the property passed to the buyer; and (4) "there was an arm's length withdrawal of capital by Respondent and a corresponding investment by the Buyer."[13] Having thus found a "sale," the Board applied its automatic rule and concluded that the employer had no duty to bargain.
 
 
 24
 These findings of fact, however, have only the most tenuous connection with the existence in a given case of the kinds of employer interests that the Board itself argued would justify a blanket exemption.[14] The employer's duty to bargain may cost him time and it may threaten the confidentiality of his negotiations; these problems exist whether he is negotiating a subcontract, a sale, or a franchise. But these costs can hardly be said to increase because "title" passes, because day-to-day management changes hands, because he used the words "buyer" and "seller," or even necessarily because capital is withdrawn by the employer and invested by the "buyer."
 
 
 25
 And, if Fibreboard's analysis is applied, these findings of fact are even less adequate. They omit many facts necessary to a determination of the employer's interests, and they shed no light at all on the employees' interests. Indeed, the most significant difference between this case and Fibreboard is probably the choice of forms made by the draftsmen who prepared the documents.[15]
 
 
 26
 I think the Board's action under review amounts virtually to an invitation to employers to circumvent Fibreboard. I therefore respectfully dissent from this Court's affirmance of that action.
 
 
 
 *
 Sitting by designation pursuant to Title 28, U.S.C. Section 294(a)
 
 
 [1]
 Section 8(a) provides:
 "It shall be an unfair labor practice for an employer . . .
 " to refuse to bargain collectively with the representatives of his employees [as to 'rates of pay, wages, hours of employment or other conditions of employment']".
 
 
 [1]
 Prior to this 3-to-2 decision, 191 N.L. R.B. No. 149 (1971) (Members Fanning and Brown, dissenting), the Board had engaged in case-by-case examinations of the conflicting interests of the employees and management. See Ozark Trailers, 161 N.L.R.B. 561 (1966)
 
 
 [2]
 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964)
 
 
 [3]
 E. g., NLRB v. American Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952)
 
 
 [4]
 For the purposes of this section, to bargain collectively is the performance of the mutual obligation . . . to meet . . . and confer in good faith with respect to wages, hours, and other terms and conditions of employment
 National Labor Relations Act Sec. 8(d), 29 U.S.C. Sec. 158(d) (1970).
 
 
 [5]
 379 U.S. at 213, 85 S.Ct. at 404
 
 
 [6]
 Majority opinion at 424 (quoting NLRB v. Royal Plating & Polishing Co., 350 F.2d 191 (3d Cir. 1965))
 
 
 [7]
 Striking this balance in favor of an employer in a recent case, the Supreme Court reaffirmed the propriety of the approach, suggesting as it did so that employee interests remain a weighty factor:
 This is not to say that application of Oliver and Fibreboard turns only on the impact of the third-party matter on employee interests. Other considerations, such as the effect on the employer's freedom to conduct his business, may be equally important. See Fibreboard Corp. v. NLRB, supra, 379 U.S. at 217, [85 S.Ct. 398, at 406] (Stewart, J., concurring). But we have no occasion in this case to consider what, if any, those considerations may be.
 Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co., 404 U.S. 157, 179 n. 19, 92 S.Ct. 383, 398 n. 19, 30 L.Ed.2d 341, 358 (1971).
 
 
 [8]
 191 N.L.R.B. No. 149 (1971)
 
 
 [9]
 A perceptive analysis of the problem, including proposals for a general rule that would take account of more of the relevant factors, is Schwarz, Plant Relocation or Partial Termination-The Duty to Bargain, 39 Fordham L.Rev. 81 (1970)
 
 
 [10]
 This point also emerges from the Board's own brief:
 "'Sale' is a word of precise legal import. It means at all times, a contract between parties, to give and to pass rights of property for money, which the buyer pays or promises to pay to the seller for the thing bought and sold." Williamson v. Berry, 49 U.S. 495, 544, 8 How. 508, 558 [12 L.Ed. 1170] (1850); Union Stock-Yards & Transit Co. v. Western Land & Cattle Co., 59 F. 49, 53 (C.A. 7, 1893); Helvering v. Nebraska Bridge Supply & Lumber Co., 115 F.2d 288, 290 (C.A. 8, 1940).
 Brief for Appellant at 23 n. 8.
 
 
 [11]
 See, e. g., Int.Rev.Code of 1954, Secs. 165, 267, 1002. It further appears that the Board may have used at least a part of the tax-related definitions by importing the concept of an "arm's-length" transaction. See text accompanying note 13 infra
 
 
 [12]
 A "total closing" is an entirely distinct matter, as a result of the Supreme Court's decision in Darlington Manufacturing Co. v. NLRB, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). Darlington involved an alleged violation of Sec. 8(a)(3), 29 U.S.C. Sec. 158(a)(3) (1970), which prohibits discrimination in terms of employment that is intended to discourage the exercise of rights guaranteed by the National Labor Relations Act
 Reversing a Fourth Circuit holding that the closing of one plant in a multi-plant company is entirely within the prerogative of an employer, and thus does not constitute any unfair labor practice, the Supreme Court spoke more broadly than Sec. 8(a)(3) violations:
 We hold here only that when an employer closes his entire business, even if the liquidation is motivated by vindictiveness toward the union, such action is not an unfair labor practice.
 380 U.S. at 273-274, 85 S.Ct. at 1001 (dictum). Having held, however, that "partial closings" could, under certain circumstances, constitute violations of Sec. 8(a)(3), the Court did not consider such actions under the other prohibitions of Sec. 8(a). See id. at 367 n. 5, 85 S.Ct. 994.
 
 
 [13]
 191 N.L.R.B. No. 149 (1971)
 These findings raise an additional problem, less important only because it is limited to the case before us. The last three are only questionably supported by the record, which in relevant part consists solely of the "agreement"-which establishes a close symbiotic relationship between GM and the retailer-with all prices deleted. Joint Appendix 240-63. The agreement includes a franchise agreement, a sublease of the real property, and a sale of the personal property. If the franchise is removed, the sublease may be cancelled by either party, see Joint Appendix 243, and the franchisee may exercise his option to sell the personal property back to GM. Joint Appendix 252.
 
 
 [14]
 See text accompanying note 8 supra
 
 
 [15]
 In Fibreboard the Court found it unnecessary to discuss the precise nature of the agreement-thus suggesting the insignificance of this factor. But one may speculate as to whether the cleaning equipment formerly used by the company employees was conditionally leased or sold to the subcontractor. Compare that possibility with the instant arrangement, set forth in note 13 supra